41 P.3d 174

**STATE of Hawai'i, Plaintiff–Appellant,**

v.

**Kenny HARADA, Faavesi Save, and Glenn Aoki, Defendants–Appellees.**

**No. 22356.**

Supreme Court of Hawai'i.

Feb. 25, 2002.

As Amended Feb. 27, 2002.

Bryan K. Sano, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellant.

Theodore Y.H. Chinn, Deputy Public Defender, on the briefs, for defendant-appellee Kenny Harada.

Louis Michael Ching, on the briefs, Honolulu, for defendant-appellee Faavesi Save.

Logan F. Young, on the briefs, Honolulu, for defendant-appellee Glen Aoki.

MOON, C.J., LEVINSON, and NAKAYAMA, JJ.

Opinion of the Court by MOON, C.J.

Plaintiff-appellant State of Hawai'i (the prosecution) appeals the first circuit court's [1] grant of defendant-appellee Kenny Harada's motion to suppress evidence, in which co-defendants-appellees Faavesi Save and Glen Aoki joined [hereinafter, defendants' motion to suppress]. On appeal, the prosecution essentially contends that: (1) the trial court erred when it concluded that the Honolulu Police Department (HPD) officers' use of force to prevent Harada from closing his door, without demanding entry, constituted an unlawful breaking, in violation of the "knock and announce" requirements of Hawai'i Revised Statutes (HRS) § 803-37 (1993); [2] and (2) even if force was used, exigent circumstances existed that required the officers to enter the residence excusing their compliance with the knock and announce rule. Based on the discussion below, we hold that a breaking occurred when the police officer used force to prevent Harada from closing the door. Consequently, the requirements of HRS § 803-37 were triggered, and the officers' failure to expressly demand entrance as they entered Harada's apartment constituted an unlawful breaking, in violation of the knock and announce rule. We also hold that the prosecution failed to properly preserve the issue whether there were exigent circumstances at the time the warrant was executed that excused the officers' compliance with HRS § 803-37. Consequently, the issue has been waived. Accordingly, we affirm the trial court's order granting the defendants' motion to suppress.

## I. BACKGROUND

Harada filed a pretrial motion to suppress evidence gathered after the allegedly unlawful execution of a search warrant for narcot-

---

1. The Honorable Frances Q.F. Wong presided over Harada's motion to suppress.

2. HRS § 803-37 provides that:
 The officer charged with the warrant, if a house, store, or other building is designated as the place to be searched, may enter it without demanding permission if the officer finds it open. If the doors are shut the officer must declare the officer's office and the officer's business, and demand entrance. If the doors, gates, or other bars to the entrance are not immediately opened, the officer may break them. When entered, the officer may demand that any other part of the house, or any closet, or other closed place in which the officer has reason to believe the property is concealed, may be opened for the officer's inspection, and if refused the officer may break them.

ics at his residence (the residence). The following relevant facts were adduced at the suppression hearing on February 12, 1999.

Pursuant to a valid search warrant, HPD Officer Murumoto and other HPD officers executed a search of Harada's residence on October 29, 1998. Prior to executing the search warrant, HPD Detective Struss determined that a ruse should be used to enter the residence. The ruse involved the use of two plain-clothes undercover female officers, whom Harada had previously met through a friend. On October 29, 1998, the female officers knocked on the door of Harada's residence and called out his name. Although he looked through the peephole, Harada did not see any of the other HPD officers waiting to execute the search warrant.

Upon seeing the door knob begin to move, the undercover female officers jumped aside to allow the search team to enter the residence. Harada testified that he opened the door approximately eight to twelve inches then quickly attempted to shut the door when he felt someone begin to push the door open.

Although Harada testified that he was unaware that a police officer was pushing the door open, the circuit court specifically found the testimony of Officer Bermudes, the officer closest to the door, credible. Officer Bermudes testified that Harada opened the door "three-quarters" of the way open, or approximately three feet, and that he saw Harada's face before Harada attempted to close the door. Officer Bermudes also testified that, as Harada opened the door, other search team members immediately began yelling, "Police! Search Warrant!" As Harada attempted to shut the door, Officer Bermudes used his body and arm to completely open the door by using "quite a bit" of force. In addition, while forcing the door open, Officer Bermudes yelled, "Police. Search Warrant. Get on the ground." No officers, however, expressly demanded entry into the residence to execute the search warrant. In addition to securing Harada, after entering the apartment, the officers secured codefendants Aoki and Save in the living room. The officers also secured another male, Karl Koja, after he ran from the living room into the bathroom, and a woman, Tok Kwon, in the living room.

After securing the residence, the officers conducted a search and discovered three ziplock bags of methamphetamine and various drug paraphernalia. At the time of the warrant's execution, with the exception of Harada, the other four persons were seen within approximately five feet of the seized contraband.

At the conclusion of the hearing, the circuit court orally granted Harada's motion to suppress and subsequently entered the following pertinent Findings of Fact (FOF) and Conclusions of Law (COL):

### FINDINGS OF FACT

. . . .

4. The Narcotics/Vice officers determined that a "ruse" should be used and had two plain-clothes female police officers approach the door, knock and call out, "Kenny." The officers executing the search were out of sight of the peephole in the door.

5. As soon as the female officers saw the door handle begin to move, they jumped aside to allow the search team access. . . .

6. [Harada] opened the door several inches and then Officer Bermudes and the rest of the search team entered the apartment a few seconds after, some members of the Search team yelled, "Police! Search Warrant!"

7. While [Harada] attempted to shut the door, Officer Bermudes, who was the first officer in line at the door, used his arm and body to completely open the door to allow entry. He yelled, "Police! Search Warrant! Get on the ground," after the door started opening.

. . . .

9. No one demanded to be allowed to enter the apartment.

### CONCLUSIONS OF LAW

3. The use of a ruse by the police is legal and appropriate. The ruse in this case failed only because of the method and

timing of the actual entry of the uniformed officers.

. . . .

6. *Dixon's* cite [ (referring to *State v. Dixon*, 83 Hawai'i 13, 924 P.2d 181 (1996)) ] to *Dickey v. United States*, 332 F.2d 773 (9th Cir.), *cert. denied*, 379 U.S. 948, 85 S.Ct. 444, 13 L.Ed.2d 545 (1964), that "[h]ad the officers obtained, by ruse, a partial opening of Dickey's door, and if they had then forced open the door the rest of the way to gain entrance, this would have been a breaking ..." (*Dixon*, [83 Hawai'i] at 19 [924 P.2d 181], citing *Dickey*, [332 F.2d] at 777–778), is applicable in the instant case to determine a breaking occurred.

. . . .

8. The use of force to complete the opening of the door in the instant case rendered the ruse illegal under *Dixon*.

9. Concomitantly, the [c]ourt finds there was no proper "knock and announce" under HRS § 803–37.

The prosecution timely appeals the trial court's order granting the defendants' motion to suppress.

## II. *STANDARDS OF REVIEW*

 We review a circuit court's findings of fact in a pretrial ruling according to the following standard:

> Appellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the clearly erroneous standard. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made.

*State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (citations and internal quotation marks omitted). "The circuit court's conclusions of law are reviewed under the right/wrong standard." *State v. Pattioay*, 78 Hawai'i 455, 459, 896 P.2d 911, 915 (1995) (citation omitted).

*State v. Wilson*, 92 Hawai'i 45, 48, 987 P.2d 268, 271 (1999).

## III. *DISCUSSION*

The prosecution contends that the method and manner in which the search warrant was executed was lawful. In the alternative, the prosecution contends that, if the knock and announce rule of HRS § 803–37 was invoked, exigent circumstances existed that excused the officers' compliance with the knock and announce rule of HRS § 803–37.

### A. *The Knock and Announce Rule*

 The question whether the knock and announce requirements are invoked during the execution of a search warrant focuses upon whether there has been a breaking. *See State v. Dixon*, 83 Hawai'i 13, 16, 924 P.2d 181, 184 (1996). Although a breaking "connotes some use of force," that force may be no more than that required to turn a doorknob. *See id.* at 18, 924 P.2d at 186 (stating that "[a]n unannounced intrusion into a dwelling ... is no less an unannounced intrusion whether officers break down a door, force open a chain lock on a partially open door, open a locked door by use of a passkey, or ... open a closed but unlocked door" (citation and emphasis omitted)). However, where the police gain entry into a place to make an arrest or to search via the use of a ruse without the use of force, there is no breaking; thus, the knock and announce rule is not implicated. *Id.* at 21, 924 P.2d at 189; *State v. Eleneki*, 92 Hawai'i 562, 566, 993 P.2d 1191, 1195 (2000) (holding that the use of a ruse does not necessarily violate HRS § 803–37).[3] But, where a ruse is ac-

---

**3.** In his concurring and dissenting opinion, Justice Acoba rejects this court's previous determinations that the use of a ruse neither violates the federal and state constitutions nor HRS §§ 803-11 and 803-37 as construed in *Dixon* and *Eleneki, supra*. "As a general rule, we do not lightly disregard precedent." *Francis v. Lee Enterprises, Inc.*, 89 Hawai'i 234, 236, 971 P.2d 707, 709 (1999). However, a rule established by precedent is not infallible. *See id.* Thus, where unintended injury would result from following a previous decision or where judicial errors cannot be reconciled with basic principles of law, we have determined that "[i]t is generally better to establish a new rule than to follow a bad precedent." *See id.* (citing *Parke v. Parke*, 25

companied by the use of force to gain entry during the execution of a search warrant, police officers are required to comply with HRS § 803-37. *See id.* at 566, 993 P.2d at 1195. Thus, where a breaking occurs or force is used, officers are required to comply with applicable knock and announce requirements regardless of whether they are executing a search or an arrest warrant. *Id.*

In his dissenting opinion, Justice Ramil, also citing *Eleneki*, concludes that, "after a door is considered 'open,' police officers do not need to comply with the knock and announce requirements." J. Ramil, dissenting op. at 31, 41 P.3d at 187. Justice Ramil goes on to say—and seemingly concludes—that "[w]hether force is subsequently used is *irrelevant* to [determining the officers' need to comply with the knock and announce requirements]." *Id.* at 4, 993 P.2d 1191. In other words, if a door is open, no matter how slight, police officers need not knock and announce *regardless* of whether force is used. The foregoing conclusion, however, is contrary to Hawai'i and most federal and state case law.

Given the internal inconsistencies contained within *Eleneki*, Justice Ramil's position is not completely unfounded. The relevant analysis as set forth in *Eleneki* is as follows:

In *Dixon*, we held that "HRS § 803-11 is not implicated where entry is gained through an open door without use of force." 83 Hawai'i at 21, 924 P.2d at 189. In the present case, although the ruse prompted Foster to partially open the door, Officer Kenui had to use force to gain entry because Foster attempted to close the door after recognizing Kenui.

*Because force was used, the officers were required to comply with HRS § 803-37 and Garcia.* The circuit court did not reach the issue whether the officers complied with HRS § 803-37 and *Garcia;* the ICA held that the requirements were not satisfied. We disagree with the ICA.

HRS § 803-37 provides that officers executing a search warrant "may enter [the place to be searched] without demanding permission if the officer finds it open. If the doors are shut the officer must declare the officer's office and the officer's business, and demand entrance." Under [HRS] § 803-37 and *Garcia,* if the occupants do not open the door after the officers knock and announce, the officers may break the door after giving the occupants a reasonable time to respond. In the present case, the officers employed a permissible ruse, which induced Foster to open the door approximately one foot. This was sufficient to render the door "open" for purposes of the statute. *Therefore, the officers were not required to knock and announce before entering,* and *the force used* by the officers to further open the door against Foster's resistance *was not a breaking.*

*Eleneki,* 92 Hawai'i at 566–67, 993 P.2d at 1195–96 (emphases added).[4] As emphasized above, *Eleneki* states, first, that the knock and announce statute was implicated (based on the officer's use of force) and, second, that it was not implicated (because the force used by the officers did not constitute a breaking). Notwithstanding this internal conflict, it was unnecessary in *Eleneki* to resolve whether the statute was implicated because the officers had complied with the

Haw. 397, 401 (1920)). "Although the doctrine of stare decisis is subordinate to legal reasons and justice, a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." *State v. Stocker,* 90 Hawai'i 85, 95, 976 P.2d 399, 409 (1999) (internal quotation signals and citation omitted). Justice Acoba has not pointed to any judicial "error" in reasoning that was not previously considered or any unintended injury that justifies abandoning the principles of stare decisis with respect to our previous constitutional and statutory analysis. Additionally, we have found no jurisdiction that holds the use of a ruse to be unconstitutional; nor have we discovered any

other jurisdiction, with or without statutory language similar to ours, that has construed the warrant statute(s) to preclude the use of a ruse. Accordingly, we are not persuaded by Justice Acoba's opinion.

4. Notably, the opening section of *Eleneki* states:

We hold that the use of a ruse is not prohibited in the execution of a search warrant. However, when the police use force to gain entry, they are required to comply with HRS § 803-37 and *Garcia.*

*Eleneki,* 92 Hawai'i at 563, 993 P.2d at 1192.

knock and announce rule by declaring "police, search warrant, we demand entry" as they were pushing open the door. *Id.* at 567, 993 P.2d at 1196. In this case, however, the officers failed to state "we demand entry" as they entered and, thus, did not comply with the knock and announce rule. As such, this case presents us with the opportunity to correct the conflicting language in *Eleneki.*

 The analysis in *Eleneki* relies primarily on *State v. Dixon,* 83 Hawai'i 13, 924 P.2d 181 (1996), and *United States v. Contreras–Ceballos,* 999 F.2d 432 (9th Cir.1993). Our review of those two cases and the cases upon which they rely demonstrate that the use of force in gaining entry is not only relevant to whether the knock and announce statute is implicated, it is a primary factor in making such determination.

In *Eleneki,* we held that "the rule established in *Dixon* [regarding the execution of *arrest* warrants] also applies to the execution of search warrants[.]" *Eleneki,* 92 Hawai'i at 566, 993 P.2d at 1195. The *Dixon* rule, to which we referred in *Eleneki,* was that the applicable knock and announce statute "is not implicated *where entry is gained* through an open door *without [the] use of force.*" *Dixon,* 83 Hawai'i at 21, 924 P.2d at 189 (emphases added). The logical corollary is that, where force is used to gain entry, the statute is implicated.[5] In *Dixon,* it was unnecessary to determine as much because force was not used.

In arriving at the *Dixon* rule, this court surveyed numerous federal and state cases that have held that gaining entrance via the use of a ruse *without force or threat of force* does not violate the knock and announce rule. *See id.* at 18–20, 924 P.2d at 186–88 (citing: (a) *Leahy v. United States,* 272 F.2d 487, 489 (9th Cir.1959) (holding that the officers were not required to knock and announce because

no "breaking" occurred where a ruse was employed to open the door *without the element of force* ); (b) *Dickey v. United States,* 332 F.2d 773, 778 (9th Cir.1964) (holding that "the employment of a ruse to obtain the full opening of the [defendant's] door *unassociated with force* was not a 'breaking' " (emphasis added)); (c) *Gatewood v. United States,* 209 F.2d 789, 791 (D.C.Cir.1953) (holding that officers' entrance "through *falsehood followed by force,* without first disclosing ... the true reason they desired to enter" constituted an unlawful breaking); (d) *United States v. Beale,* 445 F.2d 977, 978 (5th Cir. 1971) (holding, on petition for rehearing, that entrance gained by deception, and *"wholly without [the] application of force,"* is not governed by the knock and announce rule (emphasis added)); (e) *United States v. Syler,* 430 F.2d 68, 70 (7th Cir.1970) (holding that no "breaking" occurred where a defendant partially opened the door and agents opened the door further and entered because "[n]o attempt was made to bar his way and *no force was applied* in gaining entry" (emphasis added)); (f) *United States v. Raines,* 536 F.2d 796, 800 (8th Cir.1976) (holding that "[a] police entry into a private home by invitation *without force,* though the invitation be obtained by a ruse, is not a breaking and does not invoke the [knock and announce rule]" (emphasis added)); (g) *State v. Iverson,* 272 N.W.2d 1, 5 (Iowa 1978) (holding that entrance to a home gained by ruse was reasonable *where "[n]o force was threatened or used "* and "[n]o breaking occurred" (emphasis added)); (h) *Palmer v. State,* 426 So.2d 950, 953 (Ala.Crim.App.1983) (stating that "an entry obtained by deception or ruse, *without the use of any force,* is not violative of the knock and announce statute" (emphasis added)); and (i) *Ryals v. State,* 498 So.2d 1365, 1366 (Fla.Dist.Ct.App.1986) (adopting the rationale of the cases holding that entry by deception does not violate the knock and

---

5. As previously indicated, the case at bar presents us with the opportunity to correct the conflicting language in *Eleneki.* *See* discussion, *supra* at 23, 41 P.3d at 179. In so doing, we recognize that we inadvertently stated in the second paragraph of the portion of *Eleneki* discussed *supra* at 23, 41 P.3d at 179 that "the force used by the officers to further open the door against Foster's resistance was not a break-

ing." Considering *Eleneki* as a whole, the aforementioned statement was obviously a mistake. Nevertheless, Justice Acoba seizes upon our inadvertent mistake in support of his assertion that *Eleneki* and *Dixon* are inconsistent with each other. *See* J. Acoba, concurring and dissenting op. at 47, 41 P.3d at 203. However, a careful reading of the analysis in this opinion demonstrates that they are not.

announce rule because *no "breaking" or use of force occurs* (emphasis added))).

Justice Ramil indicates that seven of the nine foregoing cases involve situations where no force was used, seemingly suggesting that these cases are, therefore, inapplicable to this case. J. Ramil, dissenting op. at 34, 41 P.3d 190. All nine cases, however, are cited in *Dixon* [hereinafter, the *Dixon* cases] and support our interpretation of the proposition espoused therein, with which Justice Ramil has no dispute. The *Dixon* cases also support our interpretation of the proposition for which *Eleneki* stands. Justice Ramil's implication that these cases are inapplicable to this case ignores the fact that these cases permit the use of a ruse *because* no force or threat of force was involved—which is precisely why these cases *are* relevant.

Additionally, with respect to the remaining two cases cited above, *Gatewood* and *Syler,* Justice Ramil indicates that *Gatewood* is "inapplicable" and that *Syler,* "indeed," is contrary to the majority's holding in the case at bar. *See* J. Ramil, dissenting op. at 34–35, 41 P.3d 190–91. The central proposition in *Gatewood*—that officers may not gain entrance to a person's home through *"falsehood followed by force,* without first disclosing to [that person] the true reason they wish to enter," is directly relevant to our holding in this case. Moreover, the proposition for which we cited *Gatewood* still stands in that jurisdiction. *See United States v. Covington,* 385 A.2d 164, 167 (D.C.1978) (cited in *Coleman v. United States,* 728 A.2d 1230 (D.C. 1999)).

Next, Justice Ramil indicates that *Syler* "actually contradicts [our] proposition" and points to the following language from *Syler:*

> We also agree with the district court's finding that *force was not employed to gain entrance* to the bungalow and no violation of the principles of *Sabbath v. United States* [, 391 U.S. 585 [88 S.Ct. 1755, 20 L.Ed.2d 828] (1968),] occurred. The facts conceded by defendant show that the *front door was already open.* Apparently responding to the announcement of the arrival of the "Gas man," *defendant unlatched the screen door and partly opened it. [The officer] merely completed the operation voluntarily initiated by de-*

fendant. **No attempt was made to bar his way and no force was applied in gaining entry.**

J. Ramil, dissenting op. at 35, 41 P.3d at 191 (quoting *Syler,* 430 F.2d at 70) (underscored emphases in dissent) (bold emphases added). Based on the foregoing, Justice Ramil concludes that, "according to the reasoning of this case ... an officer's further opening of an already open door is not considered use of force to gain entry." J. Ramil, dissenting op. at 35, 41 P.3d at 191. To the contrary, the boldly emphasized language above clearly indicates that the court in *Syler* determined that no force was used and no attempt was made to bar the officer's from entering the premises. Thus, *Syler* supports rather than contradicts our holding today.

Finally, Justice Ramil indicates that seven of the nine *Dixon* cases are from the 1950s, 60s, and 70s, the remaining two being a 1986 opinion from the Florida District Court of Appeal and a 1983 opinion from the Alabama Court of Criminal Appeals. J. Ramil, dissenting op. at 35–36, 41 P.3d at 191–92. Interestingly, Justice Ramil does not explain how any of these cases are "bad law"—and, in fact, they are not. With the exception of *Eleneki* and *Contreras–Ceballos*—both of which are extensively discussed in this opinion,—Justice Ramil does not cite to *any* cases that stand for propositions contrary to the *Dixon* cases. Moreover, that these "old" cases have not been overruled or contradicted underscores the fact that the rationale expressed in each of them is not only directly relevant today, but has steadfastly stood the test of time.

Moreover, some of the cases cited specifically addressed the situation where officers force open a door that the occupant has voluntarily opened, but is then attempting to close. *See Leahy v. United States,* 272 F.2d 487, 489 (9th Cir.1959) (distinguishing the facts of *Leahy* from cases in which the occupant had voluntarily opened the door and then attempted to close it because the element of force was not present in *Leahy* ), *cert. granted,* 363 U.S. 810, 80 S.Ct. 1246, 4 L.Ed.2d 1152, *cert. dismissed,* 364 U.S. 945, 81 S.Ct. 465, 5 L.Ed.2d 459 (1961); *Dickey v. United States,* 332 F.2d 773, 777–78 (9th Cir.) (noting that, if the officers had obtained a

partial opening and had forced the door open the rest of the way to gain entrance, that would have been a "breaking"), *cert. denied,* 379 U.S. 948, 85 S.Ct. 444, 13 L.Ed.2d 545 (1964); *United States v. Beale,* 445 F.2d 977, 978 (5th Cir.1971) (noting that *Sabbath v. United States,* 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968), "left undisturbed the existent distinction between entry where some force is employed and entry where force is not an element at all"), *cert. denied,* 404 U.S. 1026, 92 S.Ct. 697 (1972).

As stated above, after surveying the foregoing cases, this court, in *Dixon,* held that the knock and announce statute "is not implicated *where entry is gained* through an open door *without the use of force." Dixon,* 83 Hawai'i at 21, 924 P.2d at 189 (emphases added); *see also, e.g., United States v. Covington,* 385 A.2d 164 (D.C.1978) (citing a number of courts that have "approved the use of a ruse to gain peaceful entry" and noting that "[t]he critical factor in each of those cases ... was that the police used force to prevent the door from being closed without first announcing their authority and purpose") (cited with approval in *Coleman v. United States,* 728 A.2d 1230 (D.C.1999)); *Adcock v. Commonwealth,* 967 S.W.2d 6 (Ky. 1998) ("[F]ederal and state courts in interpreting either knock and announce statutes or the common law knock and announce rule are in general agreement that there is no constitutional impediment to the use of subterfuge. Entry gained through the use of deception, *accomplished without force,* is not a 'breaking' requiring officers to first announce their authority and purpose."). Based upon the foregoing, the use of force in gaining entrance into a place to be searched is clearly relevant to whether the officers must "knock and announce." Consequently, Justice Ramil's conclusion that the use of force is irrelevant to that determination is clearly unfounded.

■ Justice Ramil's dissenting opinion seems to focus on the fact that the force used was *subsequent* to the door being voluntarily opened. Specifically, Justice Ramil states that "the majority mischaracterizes the fact pattern" by describing the ruse as "accompanied by the use of force." J. Ramil, dissent-ing op. at 32, 41 P.3d at 188. In Justice Ramil's view, "the ruse ... was not actually '*accompanied* by the use of force,' as claimed by the majority, but rather *[was] followed* by the use of force[.]" *Id.* (citation omitted) (emphases in original). We disagree. The assertion that a breaking does not occur where force is applied *subsequent* to a voluntary opening of a door is disingenuous because force is being used to gain entry in any event. Therefore, the force used constitutes a breaking. Moreover, the focus in determining the applicability of the knock and announce statute is properly on whether there has been a breaking. *See Dixon,* 83 Hawai'i at 16, 924 P.2d at 184.

Justice Ramil maintains that the Ninth Circuit's decision in *United States v. Contreras–Ceballos,* 999 F.2d 432 (9th Cir.1993), is "in diametric contradiction" to the *Dickey* analysis that we adopt. J. Ramil, dissenting op. at 36, 41 P.3d at 192.

In *Contreras–Ceballos,* the Ninth Circuit stated:

This court has not squarely faced the question whether use of force after achieving, by means of deception, a voluntary partial opening of an entryway implicates the knock-and-announce statute. In earlier decisions, however, we have held that a law enforcement officer's use of a ruse to gain admittance does not implicate [the federal knock and announce statute] because it entails no breaking. *Dickey v. United States,* 332 F.2d 773, 777–78 (9th Cir.), *cert. denied,* 379 U.S. 948 [85 S.Ct. 444, 13 L.Ed.2d 545] (1964); *Leahy v. United States,* 272 F.2d 487, 489 (9th Cir. 1959), *cert. granted,* 363 U.S. 810 [80 S.Ct. 1246, 4 L.Ed.2d 1152] (1960), and *cert. dismissed,* 364 U.S. 945 [81 S.Ct. 465, 5 L.Ed.2d 459] (1961).

These decisions leave us with little alternative but to uphold the action of the officers in this case. Under *Dickey* and *Leahy,* the officers were not in violation of [the federal knock and announce statute] when [an apartment occupant] opened the door in response to the officers' ruse. *The officers then stated their identity, authority and purpose. At that point, the purposes of [the statute] had been fully served.*

The warrant held by the officers entitled them to search whether or not their search was resisted. Their use of force to keep the door open, and to enter, *did not implicate* [the statute]. *Accord United States v. Salter*, 815 F.2d 1150, 1152 (7th Cir.1987).[6] *Contreras–Ceballos*, 999 F.2d at 435 (emphases added). Although the Ninth Circuit stated that the officer's use of force did not implicate the federal knock and announce statute, the court was also attempting to follow *Dickey* and *Leahy*.

In *Dickey*, agents gained entry into the premises by disguising their voices and answering, "[I]t's Lacey, open up" when the occupant asked, "[W]ho's there?" The door was then opened, and the officers at no time used force. Analogously, in *Leahy*, an agent gained admittance into the defendant's premises by stating that he was an agent from the County Assessor's office. Once inside, he stated his real purpose; again, no force was ever used. The courts in both *Dickey* and *Leahy* distinguished the facts of their respective cases from situations where force is applied after the door is open in order to gain entry. *See Dickey*, 332 F.2d at 777–78 (noting that, if the officers had obtained a partial opening and had forced the door open the rest of the way to gain entrance, there would have been a "breaking"); *Leahy*, 272 F.2d at 489 (distinguishing the facts of *Leahy* from cases in which the occupant had voluntarily opened the door and then attempted to close it because the element of force was not present in *Leahy*).

In *Contreras–Ceballos*, the Ninth Circuit did not expressly indicate that it was attempting to modify or overrule any previous decision. Based on the foregoing, we disagree that *Contreras–Ceballos* contradicts *Dickey* or that it effected a change in federal law.

In further support of his assertion that "recent federal cases do not support the majority's position," J. Ramil, dissenting op. at 36, 41 P.3d at 192, Justice Ramil cites to *United States v. Phillips*, 149 F.3d 1026, 1029 (9th Cir.1998), which he asserts "reaffirmed [the proposition] that 'knock and announce' requirements apply only to closed—not open—doors[.]" J. Ramil, dissenting op. at 37, 41 P.3d at 193. *Phillips*, however, is factually inapposite to this case. *Phillips* did not involve the execution of a search warrant or the use of a ruse; rather, the police were called to a home by its owner, who left a door unlocked and opened. Thus, the officers not only entered with the consent of the owner, but they also did so due to exigent circumstances (that is, the defendant, who was not welcome in the home, was apparently high on methamphetamine and threatening to forcibly remove a third person from the home). *Phillips*, 149 F.3d at 1028–29. Moreover, *Phillips* cites cases from 1970 and 1971 for the very proposition that Justice Ramil purports is not supported by recent federal cases. Specifically, *Phillips* states:

[The knock and announce statute] requires that police officers "not open the closed door of a dwelling until they have been refused admittance." *Contreras–Ceballos*, 999 F.2d at 434. We agree with the district court that the statute does not apply to officers who enter through open doors. *See United States v. Valenzuela*, 596 F.2d 1361, 1365 (9th Cir.1979) ("entry through an open door is not a 'breaking' within the meaning of the statute"); *United States v.*

---

**6.** In *Salter*, a police officer, posing as a hotel clerk, called the defendant and requested that she come to the front desk to sign a paper. 815 F.2d at 1151. Several police officers and a Drug Enforcement Agency (DEA) agent waited outside of her room to serve a search warrant. The parties disagreed about what happened next. *Id.* According to the government, the officers stopped the defendant after she had opened the door to her room and stepped out into the hall, identified themselves, and informed her of the search warrant before they escorted her back into her room. *Id.* According to the defendant, the officers came forward in the room, pushed the door open, and did not identify themselves or inform her of the warrant until after they had taken her back into the hotel room. By both accounts, the DEA agent had placed his foot in the doorway to keep the door from closing. *Id.* The United States Court of Appeals for the Seventh Circuit concluded that this "means of entry" did not constitute an "intrusion" and that, even if the agent did push the door fully open, such action did not constitute force. *Id.* at 1152. Based on the foregoing, *Salter* is distinguishable from *Contreras–Ceballos* and from the case at bar in that the defendant in *Salter* was not attempting to close the door. Thus, the use of force was not at issue.

*Vargas,* 436 F.2d 1280, 1281 (9th Cir.1971) ("thrust of Section 3109 . . . is aimed at the closed or locked door"). Moreover, the district court correctly noted that **exigent circumstances and the owner's consent in this case would serve to negate any violation of the statute.**

*Id.* at 1029 (bold emphasis added). Based on the foregoing, *Phillips* is completely inapposite, not only to the case at bar, but also to the law surrounding the use of ruses in the execution of warrants.

Even if the Ninth Circuit intended to alter the existing rule, a proposition with which we disagree, such a holding would be contrary to the great weight of authority in the aforementioned cases. *See United States v. Seelig,* 498 F.2d 109, 113 (5th Cir.1974) (determining that the force used by officers to physically enter an apartment implicated the knock and announce rule even though the agents had employed a ruse to cause the door to be opened slightly) (citing *Sabbath v. United States,* 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968)); *Smith v. United States,* 357 F.2d 486, 488 n. 1 (5th Cir.1966) (noting that "entrance gained by fraud or other use of deception for the purpose of effecting an arrest is constitutionally permissible *so long as force is not employed* " (emphasis added)).

Furthermore, notwithstanding its statement that the statute was not implicated, the court's holding in *Contreras–Ceballos* was clearly based on the fact that, when the door was opened in response to the ruse, the officers "stated their identity, authority and purpose" because, "[a]t that point[,] the purposes of [the statute] had been fully served." *Contreras–Ceballos,* 999 F.2d at 435. Similarly, in *Eleneki,* this court stated:

> [the occupant] opened the door approximately twelve inches in responses to the officers' ruse, then attempted to close the door. The officers met his resistance and pushed the door open further, announcing "Police, search warrant, we demand entry." They repeated the announcement once inside. Their entry violated neither the terms of HRS § 803–37 nor the purposes of the knock and announce statute. Therefore, the search was valid.

*Eleneki,* 92 Hawai'i at 567, 993 P.2d at 1196 (footnote omitted). Thus, *Contreras–Ceballos* is analogous to *Eleneki* and distinguishable from the instant case because, in both *Contreras–Ceballos* and *Eleneki,* the officers had complied with the statute. Based on the foregoing and the facts of this case, we believe that law enforcement officers are required to comply with the knock and announce statute when a ruse is accompanied by force.

■ Such a requirement best serves the purposes of the rule, which are (1) to reduce potential violence to both occupants and police resulting from an unannounced entry, (2) to prevent unnecessary property damage, and (3) to protect an occupant's right to privacy. *See Eleneki* at 566, 993 P.2d at 1195 (citing *Dixon,* 83 Hawai'i at 22, 924 P.2d at 190). If police are not required to comply with the knock and announce rule upon applying force to gain entry, the potential for violence and unnecessary property damage will increase.

Justice Ramil's dissent relies heavily on the language of the statute to declare that "an officer must comply with the knock and announce rule *if the door is 'shut.'* " J. Ramil, dissenting op. at 31, 41 P.3d at 187 (emphasis added). Although the triggering language in the search warrant statute is "if the doors are shut," the triggering language in the arrest warrant statute is "when entrance is refused." *Compare* HRS § 803–11 *with* HRS § 803–37. Notwithstanding that distinction, we specifically stated in *Eleneki* that, *"[a]lthough the language of HRS §§ 803–11 and 803–37 differs, the purposes of the 'knock and announce' rule are identical in each context and the use of a ruse[, which is permissible to gain entrance in the execution of an arrest warrant,] is also consistent with those purposes in the execution of a search warrant." Eleneki,* 92 Hawai'i at 565, 993 P.2d at 1194 (emphasis added). Thus, in both contexts, we have determined that a ruse is permissible (*i.e.,* that the use of a ruse does not necessarily violate either statute)—notwithstanding the fact that the statutes are

silent on the issue—because the purposes behind the statutes are identically served.

Justice Ramil's narrow view of the search warrant statute creates an incongruity between the application of the knock and announce requirement when executing an arrest warrant and when executing a search warrant. Under the analysis proffered in Justice Ramil's dissenting opinion, an officer executing a *search* warrant will not be required to comply with the knock and announce statute when a ruse is employed, the occupant voluntarily opens the door and then attempts to close it, and the officer uses force to gain entry. By contrast, an officer executing an *arrest* warrant, under the same circumstances, would be required to comply with the knock and announce statute. This incongruity begs the question of what happens when the officers are simultaneously executing both an arrest and a search warrant. We believe that the relevant analysis should instead focus upon whether a "breaking" has occurred. *See Dixon*, 83 Hawai'i at 16, 924 P.2d at 184. Under the *Dixon* analysis and the cases previously cited, a "breaking" occurs where force is used to gain entry.

Finally, Justice Ramil contends that our analysis and conclusion in the instant case would lead to the "nonsensical procedure" described by the Ninth Circuit in *Contreras–Ceballos*. J. Ramil, dissenting op. at 38, 41 P.3d at 194. The court in *Contreras–Ceballos* stated that requiring the officers to knock and announce after the door was opened, but was subsequently being closed,

> would dictate a nonsensical procedure in which the officers, after having employed a permissible ruse to cause the door to be opened, must permit it to be shut by the occupants so that the officers could then knock, reannounce, and open the door forcibly if refused admittance.

*Contreras–Ceballos*, 999 F.2d at 435. Although we agree that the procedure described by the court in *Contreras–Ceballos* is nonsensical, police officers in the situation described would actually need only state their office, their business, and demand entry; they would not be required to wait for the door to close, or for a "reasonable" amount of time to pass.[7] Moreover, none of the cited cases require that the police, in response to an occupant's attempt to close the door, first allow the door to be closed and then mechanistically comply with the knock and announce statute.

■ Accordingly, we hold that, where a ruse is accompanied by the use of force to gain entry during the execution of either a search or arrest warrant, police officers are required to comply with the knock and announce rule.

■ Where the knock and announce rule has been triggered, the police are required to declare their office, their business, and expressly demand entry. *See State v. Monay*, 85 Hawai'i 282, 284, 943 P.2d 908, 910 (1997); *State v. Garcia*, 77 Hawai'i 461, 466, 887 P.2d 671, 676 (App.1995); HRS §§ 803–11 (1993)[8] and 803–37. In other words, the requirements of the knock and announce rule are not met when police officers fail to orally demand entry, and a demand of entry cannot be implied from simply stating, "Police, search warrant." *Monay*, 85 Hawai'i at 284, 943 P.2d at 910.

■ In the present case, the officers employed a ruse while executing the search warrant at Harada's apartment. In response, Harada opened the door, but then quickly attempted to close it. Officer Bermudes used force to prevent the door from being closed and succeeded in gaining entry. At the point that Harada opened his door in response to the ruse, there was no breaking within the meaning of HRS § 803–37. *See*

---

7. Under the circumstances described, it would be *unreasonable* to require the officers to wait. *See State v. Garcia* 77 Hawai'i 461, 468, 887 P.2d 671, 678 (App.1995) (stating that the lawfulness of the execution of a search warrant should be judged under a standard of reasonableness, taking into account the totality of the circumstances).

8. HRS § 803–11 provides that:

> Whenever it is necessary to enter a house to arrest an offender, and entrance is refused, the officer or person making the arrest may force an entrance by breaking doors or other barriers. But before breaking any door, the officer or person shall first demand entrance in a loud voice, and state that the officer or person is the bearer of a warrant of arrest; or if it is in a case in which arrest is lawful without warrant, the officer or person shall substantially state that information in an audible voice.

*Eleneki,* 92 Hawai'i at 566–67, 993 P.2d at 1195–96; *Dixon,* 83 Hawai'i at 21, 924 P.2d at 189. However, a breaking occurred when Officer Bermudes used force to prevent Harada from closing the door. Consequently, the requirements of HRS § 803–37 were triggered, and the officers were required to declare their office, their business, and demand entrance. *See Monay,* 85 Hawai'i at 284, 943 P.2d at 910. It is undisputed that none of the officers expressly demanded entrance as they entered Harada's apartment. Thus, the officers' entry did not comply with the knock and announce rule of HRS § 803–37.

### B. *Exigent Circumstances*

■■■ On appeal, the prosecution alternatively contends that exigent circumstances at the time the warrant was executed excused the police officers' compliance with HRS § 803–37. However, Harada contends that the prosecution failed to properly preserve the issue whether there were exigent circumstances and, therefore, has waived the issue. *See State v. Rodrigues,* 67 Haw. 496, 498, 692 P.2d 1156, 1158 (1985) (holding that the prosecution waived the issues of "good faith" and "exigent circumstances" exceptions to the exclusionary rule because it failed to raise the issue at trial). We agree with Harada.

### IV. *CONCLUSION*

Based upon the foregoing, we hold that a breaking occurred when Officer Bermudes used force to prevent Harada from closing the door. Consequently, the requirements of HRS § 803–37 were triggered, and the officers' failure to expressly demand entrance as they entered Harada's apartment constituted an unlawful breaking, in violation of the knock and announce rule. We also hold that the prosecution failed to properly preserve the issue whether there were exigent circum-

stances at the time the warrant was executed that excused the officers' compliance with HRS § 803–37. Consequently, the issue has been waived. Accordingly, we affirm the trial court's order granting the defendants' motion to suppress.

### Dissenting Opinion by RAMIL, J.

My disagreement with the majority centers on the proper scope of the knock and announce rule. Here, Harada voluntarily opened the door three-feet-wide (or three-quarters of the way open). After realizing that officers were outside, Harada attempted to close the door. In response, Officer Bermudes entered and prevented the door from being shut.[1] I believe that the door in this case is "open" for purposes of the knock and announce statute[2] and, therefore, the subsequent use of force in keeping the door open must be analyzed under the constitutional reasonableness of such search and seizure— not the now-inapplicable knock and announce rule. In contrast, the majority asserts that "a breaking occurred when Officer Bermudes used force to prevent Harada from closing the door." Majority at 30, 41 P.3d at 186; *accord* majority at 20, 41 P.3d at 176. Therefore, the majority considers the door "shut" for purposes of the knock and announce statute;[3] as a result, the requirements were invoked and the officers were required to declare their office, their business, and expressly demand entrance. *See id.* at 30, 41 P.3d at 186. Thus, according to the majority, the fatal mistake occurred when Officer Bermudes prevented Harada from closing the door after Harada realized that officers were outside. Furthermore, because Officer Bermudes yelled, "Police. Search Warrant. Get on the ground," he failed to expressly state the required words, "we demand entry."

---

1. The majority notes that "[a]s Harada attempted to shut the door, Officer Bermudes used his body and arm to completely open the door by using 'quite a bit' of force." Majority at 21, 41 P.3d at 177.

2. Or, under the majority's approach, that the officer had "gained entry." As discussed in Section III, regardless of the focus—either on the

"breaking" or "gaining entry," used by the majority, or on the "open door," used by me—the key question is whether the policy reasons underlying the statute are satisfied. The answer here is the same under both approaches: the policy objectives were met.

3. Or, under the majority's approach, that the officer had not "gained entry."

But the majority ignores this court's recent decision in *State v. Eleneki*, 92 Hawai'i 562, 993 P.2d 1191 (2000), recent federal case law, and the policy reasons underlying the knock and announce rule in favor of wholly irrelevant cases. Accordingly, I respectfully dissent. I would vacate the circuit court's order granting Harada's motion to suppress.

## I. *Hawai'i LAW*

Hawai'i Revised Statutes (HRS) § 803–37 (1985) establishes the "knock and announce" requirements with respect to search warrants: [4]

> The officer charged with the warrant, if a house, store, or other building is designated as the place to be searched, may enter it without demanding permission if the officer finds it open. *If the doors are shut the officer must declare the officer's office and the officer's business, and demand entrance.* If the doors, gates, or other bars to the entrance are not immediately opened, the officer may break them....

(Emphasis added.) Thus, an officer must comply with the knock and announce rule if the door is "shut." [5] This court, in *State v. Dixon*, 83 Hawai'i 13, 924 P.2d 181 (1996), explained that an officer must comply with such requirements only if there is a "breaking"—where force is involved in gaining entry of a shut door. *Id.* at 21, 924 P.2d at 189. In addition, this court specifically held that a ruse effectuating voluntary opening of a door is not a "breaking." *Id.*

In *Eleneki*, this court further instructed that the knock and announce requirements are not invoked where force is used after a door is "open." 92 Hawai'i at 566–67, 993

P.2d at 1195–96. An analysis of the following sequence of events in *Eleneki* clarifies this court's holding:

1. Officer employs ruse.
2. Occupant opens door one-foot-wide.
3. Occupant quickly tries to close door.
4. Officer meets resistance and pushes door further open announcing, "Police, search warrant, we demand entry."
5. Officer repeats announcement once inside.

*See id.* at 563, 993 P.2d at 1192. For purposes of HRS § 803–37, this court held that the door was considered "open" in Step 2. *See id.* Thus, the force used by the officer in Step 4 was not considered a "breaking" because the door was already "open." *See id.* Accordingly, this court concluded that the officer did not violate the terms of HRS § 803–37.[6] In other words, after a door is considered "open," the police officers do not need to comply with the knock and announce requirements. Whether force is subsequently used is irrelevant to this determination.

Here, the majority claims that the ruse was accompanied by the use of force to gain entry and, as such, the officers were required to comply with HRS § 803–37:

> In the present case, the officers employed a ruse while executing the search warrant at Harada's apartment. In response, Harada opened the door, but then quickly attempted to close it. Officer Bermudes used force to prevent the door from being closed and succeeded in gaining entry. At the point that Harada opened his door in response to the ruse, there was no breaking within the meaning of HRS § 803–37.

---

**4.** This court has treated arrest warrants and search warrants similarly. *See Eleneki*, 92 Hawai'i at 565, 993 P.2d at 1194 ("Although the language of HRS §§ 803–11 [arrest warrant] and 803–37 [search warrant] differs, the purposes of the 'knock and announce' rule are identical in each context and the use of a ruse is also consistent with those purposes in the execution [of both].").

**5.** Or, under similar language of HRS § 803–11 (1985), when "entrance is refused" in executing an arrest warrant. The majority appears to believe that such difference in terminology is prohibitively problematic, *see* majority at 28, 41 P.3d

at 184 even though, as discussed in Section III, the dispositive question is whether the policy reasons underlying the statutes, which are identical in each context, are satisfied. Moreover, this court in *Eleneki* focused on whether the door was "open" with respect to the execution of a search warrant. 92 Hawai'i at 566, 993 P.2d at 1195.

**6.** The subheading for Section III.C and its introductory paragraph mistakenly state that the officers used force in gaining entry and, thus, must comply with the knock and announce statute. *See Eleneki*, 92 Hawai'i at 566, 993 P.2d at 1195; *see also infra* note 7.

However, a breaking occurred when Officer Bermudes used force to prevent Harada from closing the door. Consequently, the requirements of HRS § 803-37 were triggered, and the officers were required to declare their office, their business, and demand entrance.

Majority at 29–30, 41 P.3d at 185–86 (citations omitted). But an examination of the sequence of events in this case reveals that the majority mischaracterizes the fact pattern and is inconsistent with *Eleneki*, which it cites approvingly:

1. Officer employs ruse.
2. Occupant opens door three-feet-wide (" 'three-quarters' of the way open") and officers yell, "Police! Search Warrant!"
3. Occupant quickly tries to close door.
4. Officer uses force to prevent door from closing and officer yells, "Police. Search Warrant. Get on the ground."

*See id.* at 21, 41 P.3d at 177. In this case, the ruse (Step 1) was not actually "*accompanied* by the use of force," as claimed by the majority, *id.* at 22–23, 41 P.3d at 178–79 (emphasis added), but rather *followed* by the use of force (Step 4). The close proximity in time of the opening of the door (or gaining of entry) and the officer's use of force does not mean that the knock and announce rule is implicated. Indeed, the majority has no doubt that the force used in "securing" Harada and the other occupants after gaining entry did not invoke the knock and announce requirement. *Id.* at 21, 41 P.3d at 177. Likewise, the force used in preventing the door from being shut after it had been opened and Bermudes had already gained entry does not trigger the knock and announce requirement. Thus, it is essential to determine accurately, rather than glossing glibly over, when the force is used. The majority alleges that my "assertion that a breaking does not occur where force is applied *subsequent* to a voluntary opening of a door is disingenuous be-

cause force is being used to gain entry in any event." *Id.* at 26, 41 P.3d at 182 (emphasis in original). But the majority disregards the dispositive fact that the door was open and Officer Bermudes had already gained entry. Accordingly, nearly every case cited by the majority in support of its position deals specifically with the issue of gaining entrance with or without the use of force and is, thus, irrelevant to the issue at hand. *See, e.g., id.* at 24, 41 P.3d at 180 (citing *Dixon* ), 24–25, 41 P.3d 180–81 (citing *Leahy, Dickey, Gatewood, Beale, Syler, Raines, Iverson, Palmer, Ryals* ), 26, 41 P.3d 182 (citing *Adcock* ), 28, 41 P.3d 184 (citing *Seelig, Smith* ). All that these cases establish is that which is not at issue here: if any force is used to gain entry, such breaking must comply with the knock and announce rule—the mere fact that a ruse was being employed makes no difference. But that is irrelevant to the issue in question here because the use of force by Officer Bermudes was used after entry had been gained.

Moreover, the majority asserts that, in Step 4 of this case, the officer's use of force was a "breaking." Therefore, the majority necessarily does not consider the door in Step 2 to be "open" for purposes of HRS § 803-37. Such reasoning, however, is contrary to this court's ruling in *Eleneki*. In that case, the door was opened only one foot, yet this court considered it sufficient to render the door "open." Here, however, even though the door was opened three feet, the majority maintains that the door was not "open." Though the majority selectively cites *Eleneki*, it ignores significant portions of that case, including the primary holding. This court plainly stated: [7]

> In the present case, the officers employed a permissible ruse, which induced [the occupant] to open the door approximately one foot. This was sufficient to render the

<hr>

7. Although the subheading for Section III.C and its introductory paragraph indicate that the officers used force in gaining entry and, thus, must comply with the knock and announce requirements, this court's discussion clarifies that the door was opened without the use of force and, therefore, did not invoke the knock and announce requirements. Given such internal inconsistency, it appears more reasonable that this court be guided by the four paragraphs of discussion, analysis, and reasoning, rather than a few conclusory statements in the subheading and introductory paragraph.

door "open" for purposes of the statute. Therefore, the officers were not required to knock and announce before entering, and the force used by the officers to further open the door against [the occupant's] resistance was not a breaking.

*United States v. Contreras–Ceballos,* 999 F.2d 432 (9th Cir.1993), is factually similar to the present case. In *Contreras–Ceballos,* the state troopers and postal inspectors executing a search warrant claimed to be from Federal Express. Kevin See, one of the apartment's occupants, opened the door approximately twelve inches and then attempted to close it because he saw the troopers. The lead trooper put his hand through the doorway, pushed the door open, and stepped inside while he announced, "Troopers, search warrant." The Ninth Circuit held that the search did not violate the federal knock and announce statute.

The federal knock and announce statute applicable in *Contreras–Ceballos* provided that "[t]he officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance. . . ." 18 U.S.C. § 3109 (1985). The Ninth Circuit noted that it had previously established that the use of a ruse to gain entry did not implicate § 3109 because there was no breaking and that these cases controlled the outcome in *Contreras–Ceballos.* The court stated:

> Under *Dickey [v. United States,* 332 F.2d 773, (9th Cir.1964),] and *Leahy [v. United States,* 272 F.2d 487 (9th Cir. 1959)], the officers were not in violation of section 3109 when See opened the door in response to the officers' ruse. The officers then stated their identity, authority and purpose. At that point, the purposes of section 3109 had been fully served. . . . Their use of force to keep the door open, and to enter, did not implicate section 3109.

*Contreras–Ceballos,* 999 F.2d at 435. *See also United States v. Salter,* 815 F.2d 1150, 1152 (7th Cir.1987) ("Even if, as Salter says, the officers blocked the doorway and then pushed the door fully open . . . there was no force used in this case that would implicate § 3109.").

In the present case, as in *Contreras–Ceballos,* Foster opened the door approximately twelve inches in response to the officers' ruse, then attempted to close the door. The officers met his resistance and pushed the door open further, announcing "Police, search warrant, we demand entry." They repeated the announcement once inside. Their entry violated neither the terms of HRS § 803–37 nor the purposes of the knock and announce statute. *Eleneki,* 92 Hawai'i at 566–67, 993 P.2d at 1195–96. Given that this court has already held that a door opened *one foot* is considered "open" for purposes of the knock and announce statute, it follows, *a fortiori,* that a door opened *three feet* must be considered "open" for purposes of the same statute.

In this regard, I only follow the principle of precedent. Because this court has already expressly decided that opening a door one foot is "sufficient to render the door 'open' for purposes of the statute," *id.* at 566, 993 P.2d at 1195, I reason—if not am bound to decide—that opening a door three feet must be sufficient to render the door "open" for purposes of the statute. Second, the majority overlooks the second half of my position, which is explained in Section IV: although the knock and announce requirements are not implicated when a door is considered "open," the reasonableness standard secured by the state and federal constitutions does apply. Thus, under some circumstances, the officers may well be required to knock and announce.

To avoid the reasoning in *Eleneki,* the majority attempts to distinguish the facts in that case from the facts here by claiming that the officers in the former "complied" with the knock and announce statute. The majority repeatedly insists, "[I]t was unnecessary in *Eleneki* to resolve whether the statute was implicated because the officers had complied with the knock and announce rule by declaring 'police, search warrant, we demand entry' *as they were pushing open the door.*" Majority at 23–24, 41 P.3d at 179–80 (emphasis added). But the statute and this

court have incontrovertibly established that compliance with the knock and announce requirements must occur *before*, not *while*, using force to gain entry. The knock and announce statute, which is the linchpin of the majority's argument, actually reads:

> *If the doors are shut the officer must declare the officer's office and the officer's business, and demand entrance. If the doors, gates, or other bars to the entrance are not immediately opened, the officer may break them.* When entered, the officer may demand that any other part of the house, or any closet, or other closed place in which the officer has reason to believe the property is concealed, may be opened for the officer's inspection, and *if refused the officer may break them.*

HRS § 803-37. Likewise, this court in *Dixon* expressly specified that force in breaking a door may be used *"only after* complying with the knock and announce requirements." *Dixon*, 83 Hawai'i at 21, 924 P.2d at 189. Again, this court in *State v. Monay*, 85 Hawai'i 282, 943 P.2d 908 (1997), observed that the "plain and unambiguous language of HRS § 803-37 requires police to expressly demand entrance when the doors to a place to be searched are shut *before attempting forcible entry."* 85 Hawai'i at 284, 943 P.2d at 910. In addition, this court in *Eleneki* explicitly rejected the majority's assertion by specifying that the knock and announce statute was not even invoked, no less complied with. *See Eleneki*, 92 Hawai'i at 566–67, 993 P.2d at 1195–96 ("In the present case, the officers employed a permissible ruse, which induced [the occupant] to open the door approximately one foot. This was sufficient to render the door 'open' for purposes of the statute. Therefore, *the officers were not re-quired to knock and announce before entering*, and the force used by the officers to further open the door against [the occupant's] resistance was not a breaking." (Emphasis added.)).

The majority then asserts that the *Eleneki* court relied on what the majority terms the "*Dixon* rule," which states: "The applicable knock and announce statute 'is not implicated *where entry is gained* through an open door *without [the] use of force.'* " Majority at 24, 41 P.3d at 180 (brackets and emphases in original). The majority believes that this rule and its "logical corollary . . . that, where force is used to gain entry, the statute is implicated," answers the question raised here. *Id.* at 24, 41 P.3d at 180. But the majority overlooks a key detail: entry had *already been gained* through an open door. Thus, the *Dixon* rule and its logical corollary are irrelevant in addressing the issue presented in this case: whether the knock and announce requirements are implicated where force is used *after entry is gained through an open door*.[8] Similarly, the majority's subsequent string citation of surveyed cases cannot help this court resolve the issue at hand. *See id.* at 24–25, 41 P.3d at 180–81. Seven of the nine cases listed deal with the situation where force is not used at all. I, too, agree that where no force is applied to gain entry, that the knock and announce requirements are not implicated. But that is the easy case. And not the case in question here. Rather, this court must decide whether the knock and announce requirements are implicated where entry is gained through an open door and force is used after such door is opened and entry has been gained. Of the remaining two cases dealing with force, one is inapplicable to the issue here, while the other,

---

8. Moreover, the majority overgeneralizes the discussion and ruling in that case. In *Dixon*, this court specified that "[t]he issue in this case [is] whether use of a ruse, without force or threat of force, constitutes a 'breaking' within the meaning of the 'knock and announce' statute, HRS § 803-11, requiring HPD officers to announce their presence and purpose, and demand entry." 83 Hawai'i at 16, 924 P.2d at 184. Thus, the *Dixon* court held that "HRS § 803-11 is not implicated where entry is gained through an open door without use of force." *Id.* at 21, 924 P.2d at 189. But the majority overstates the applicability of *Dixon*:

> The *Dixon* rule . . . was that the applicable knock and announce statute "is not implicated *where entry is gained* through an open door *without [the] use of force."* *Dixon*, 83 Hawai'i at 21, 924 P.2d at 189 (emphases added). The logical corollary is that, where force is used to gain entry, the statute is implicated. In *Dixon*, it was unnecessary to determine as much because force was not used.

Majority at 24, 41 P.3d at 180. In this way, the majority mistakes a limitation on the scope of the issue addressed, for the answer to a question not even asked.

indeed, counters the majority's claim. First, the 1953 case of *Gatewood v. United States*, 209 F.2d 789 (D.C.Cir.1953), deals with force *accompanying*, not *following*, the ruse.[9] Second, the 1970 case of *United States v. Syler*, 430 F.2d 68 (7th Cir.1970), actually contradicts the majority's proposition. There, the officer identified himself as a "gas man." As the occupant "unlatched the outer screen door and began to open it, [the officer] pulled it open further, entering the house with the other two officers." *Id.* at 69. Only as the officer "came through the door," did he announce that he was "a federal officer and that he had a warrant for her arrest." *Id.* The Seventh Circuit held:

> We also agree with the district court's finding that *force was not employed to gain entrance* to the bungalow and no violation of the principles of *Sabbath v. United States* occurred. The facts conceded by defendant show that the *front door was already open.* Apparently responding to the announcement of the arrival of the "Gas man," *defendant unlatched the screen door and partly opened it. [The officer] merely completed the operation voluntarily initiated by defendant. No attempt was made to bar his way and no force was applied in gaining entry.*

*Id.* at 70 (citations omitted) (emphases added). Thus, according to the reasoning of this case cited by the majority, an officer's further opening of an already open door is not considered use of force to gain entry.

Even assuming *arguendo* that *Dixon* holds the answer to the question in this case, it appears to support my position:

> In *Syler*, agents with a valid arrest warrant approached appellant's front door simultaneously with a serviceman who was there to connect the gas. The front door to the house was open, but the screen door was closed. The serviceman knocked on the door and called out, "Gas man." The serviceman then left at the agents' instructions. When no one came to the door, one of the agents yelled "gas man," and appellant unlatched and partially opened the screen door. The agents then pulled the door open further and entered. The court held that there was *no "breaking" within the meaning of 18 U.S.C. § 3109 because the agent merely completed the operation voluntarily initiated by appellant* and "[n]o attempt was made to bar his way and *no force was applied in gaining entry.*" *Id.* at 70. *See also United States v. Raines*, 536 F.2d 796, 800 (8th Cir.) ("A police entry into a private home by invitation without force, though the invitation be obtained by ruse, is not a breaking and does not invoke the common law requirement of prior announcement of authority and purpose, codified in § 3109."), *cert. denied*, 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976); *United States v. Salter*, 815 F.2d 1150 (7th Cir.1987) (holding that where officer, identifying himself as hotel clerk, telephoned appellant requesting her to come to hotel desk, and other officers positioned outside hotel room door waited until *appellant opened door, prevented her from closing door, and entered hotel room, there was no "intrusion,"* and section 3109 was not implicated by entry *through an open door*); *United States v. Contreras Ceballos*, 999 F.2d 432 (9th Cir. 1993) (*officer's use of force to keep open door that was voluntarily opened in response to officer's ruse, and to enter, did not implicate section 3109* ).

*Dixon*, 83 Hawai'i at 20, 924 P.2d at 188 (emphases added). The majority describes nine irrelevant cases from *Dixon*, without focusing on the two cases in *Dixon* that actually deal with the question at issue here.

Finally, the irrelevant cases cited by the majority do not carry substantial weight— seven of the nine cases are from the 1950s, '60s, and '70s, with the two most recent

9. Additionally, *Gatewood* disapproved of the use of not only "force," but also "falsehood," or use of a ruse, 209 F.2d at 791, which this court has expressly allowed. *See Eleneki*, 92 Hawai'i at 566, 993 P.2d at 1195; *see also Gatewood*, 209 F.2d at 791 ("The government's evidence in this case showed the officers gained entrance to Gatewood's apartment through falsehood followed by force, without first disclosing to him the true reason they desired to enter."), 791 n. 1 ("Entry by stealth can, of course, be as unlawful as entry by the illegal use of force." (citing *Gouled v. United States*, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921))).

being a 1986 opinion from the Florida District Court of Appeal and a 1983 opinion from the Alabama Court of Criminal Appeals. If, as the majority asserts, these cases from decades ago have "steadfastly stood the test of time," majority at 25, 41 P.3d at 181, where are the recent cases testifying to this? If the claim is that the case law is the same today as they were yesterday, then why would the majority insist on referring only to yesterday's cases? The answer lies in the fact that recent federal cases do not support the majority's position.

## II. *FEDERAL CASE LAW*

The Ninth Circuit[10] addressed this very issue in question, and has answered it in the same manner as *Eleneki*—and in diametric contradiction to the majority's proposition. In 1964, the Ninth Circuit stated:

Had the officers obtained, by ruse, a partial opening of Dickey's door, and if they had then forced open the door the rest of the way *to gain entrance,* this would have been a "breaking" in the sense of section 3109. But the employment of a ruse to obtain the full opening of the Dickeys' door unassociated with force, was not a "breaking." And since the door was then wide open, the subsequent entry into Dickey's room for the purpose of arresting him did not involve a "breaking" of the door.

*Dickey v. United States,* 332 F.2d 773, 777–78 (9th Cir.) (citations and footnotes omitted) (emphasis added), *cert. denied,* 379 U.S. 948, 85 S.Ct. 444, 13 L.Ed.2d 545 (1964). The majority's reasoning attempts to follow this view by applying it to this case. But, here, as described in Section I, Officer Bermudes had already gained entrance and, thus, *Dickey's* analysis is inapplicable.

More recently and more relevantly, in the 1993 case of *United States v. Contreras–Ceballos,* 999 F.2d 432 (9th Cir.1993), which this court extensively relied on in *Eleneki,* 92 Hawai'i at 567, 993 P.2d at 1196, and cited in *Dixon,* 83 Hawai'i at 20, 924 P.2d at 188, the Ninth Circuit expressly held that the knock

and announce rule does not apply to an officer's use of force to keep the door open once it has been opened. It explained,

Under *Dickey* and *Leahy[ v. United States,* 272 F.2d 487 (9th Cir.1959)], the officers were not in violation of [the knock and announce statute] when [the occupant] opened the door in response to the officers' ruse. The officers then stated their identity, authority and purpose. At that point, the purposes of [such statute] had been fully served.

*Contreras–Ceballos,* 999 F.2d at 435. In other words, the Ninth Circuit noted that the knock and announce statute's applicability ended at that point. It continued, "The warrant held by the officers entitled them to search whether or not their search was resisted. *Their use of force to keep the door open, and to enter, did not implicate section 3109.*" *Id.* (emphasis added); *see also United States v. Salter,* 815 F.2d 1150, 1152 (7th Cir.1987) (officer's preventing door that had been partially opened by occupant from closing does not implicate knock and announce requirement); *United States v. Byars,* 762 F.Supp. 1235, 1238 (E.D.Va.1991) (officer's preventing door that had been opened by occupant from closing does not implicate knock and announce requirement). Thus, the Ninth Circuit reiterated the fact that, after the door was open, the knock and announce analysis was no longer relevant. And, as if to end any further doubts about the inapplicability of the knock and announce statute after the door is open, the Ninth Circuit pointed out the folly of holding to the contrary:

To rule otherwise would dictate a nonsensical procedure in which the officers, after having employed a permissible ruse to cause the door to be opened, must permit it to be shut by the occupants so that the officers could then knock, reannounce, and open the door forcibly if refused admittance.

*Contreras–Ceballos,* 999 F.2d at 435. Although the majority concedes that such pro-

---

**10.** In examining whether the state knock and announce statutes are invoked, this court has held that "cases interpreting the federal statut[ory counterpart] are clearly relevant." *Dix-*

*on,* 83 Hawai'i at 17 n. 4, 924 P.2d at 185 n. 4; *see also Eleneki,* 92 Hawai'i at 566–67, 993 P.2d at 1195–96.

cedure is absurd, it contends that under its approach, officers "need only state their office, their business, and demand entry; they would not be required to wait for the door to close, or for a 'reasonable' amount of time to pass." Majority at 29, 41 P.3d at 185. Its reasoning is relegated to a footnote, which argues only that "it would be *unreasonable* to require the officers to wait." *Id.* at 29 n. 7, 41 P.3d at 185 n. 7 (citing *State v. Garcia,* 77 Hawai'i 461, 468, 887 P.2d 671, 678 (App. 1995)) (emphasis in original). But this explanation suffers from two flaws. First, as described in Section I, the knock and announce statute requires that any force be used only *after,* not *while,* complying with the knock and announce requirements. Second, the majority cites to the Intermediate Court of Appeals' opinion in *Garcia,* which held only that officers must wait a reasonable amount of time to allow the occupant to respond to their demand for entry, *see Garcia,* 77 Hawai'i at 468, 887 P.2d at 678, not, as the majority claims, that officers must wait a reasonable amount of time in waiting "for the door to close." Even if officers need not wait for the door to close or for a reasonable amount of time, requiring the officers to state their office and business, and demand entry, as the majority absolutely requires here, is still unreasonable. *See infra* Section III.

In a subsequent case, in 1998, the Ninth Circuit reaffirmed that the "knock and announce" requirements apply only to closed—not open—doors:

> [The knock and announce statute] does not apply to officers who enter through open doors. *See United States v. Valenzuela,* 596 F.2d 1361, 1365 (9th Cir.1979) ("entry through an open door is not a 'breaking' within the meaning of the statute"); *United States v. Vargas,* 436 F.2d 1280, 1281 (9th Cir.1971) ("thrust of [knock and announce statute] ... is aimed at the closed or locked door").

*United States v. Phillips,* 149 F.3d 1026, 1029 (9th Cir.1998).[11] The majority, however, re-

lies on "old" cases that are irrelevant majority at 24–25, 41 P.3d at 180–81, as a substitute for focusing on the recent federal case law that directly addresses the issue in question.

## III. POLICY REASONS FOR KNOCK AND ANNOUNCE RULE

In order to understand Hawai'i and federal case law, it is essential to examine the articulated purposes of the knock and announce statutes:

1. reduction of potential violence to both occupants and police resulting from an unannounced entry,

2. prevention of unnecessary property damage, and

3. protection of an occupant's right to privacy

*Eleneki,* 92 Hawai'i at 566, 993 P.2d at 1195 (quoting *Dixon,* 83 Hawai'i at 22, 924 P.2d at 190); *see also Contreras–Ceballos,* 999 F.2d at 434–35. A ruse requires the occupant to open the door consciously, thereby achieving these three objectives. Ruse entries, even if later followed by force, are "invariably characterized by some degree of advance notice; the occupant is expecting an entry." *Eleneki,* 92 Hawai'i at 566, 993 P.2d at 1195 (citation omitted); *Coleman v. United States,* 728 A.2d 1230, 1235 (D.C.1999) (citation omitted). Similarly, the Ninth Circuit, in ruling that federal agents entering an open door need not comply with the knock and announce statute, noted that the occupants expected entry: "A significant factor [in determining that the knock and announce statute was not invoked] here was the immediate presence of [Defendant] and his friend (about to be arrested) right inside the door. It was not a case of officers sneaking in and going prowling." *United States v. Vargas,* 436 F.2d 1280, 1281 (9th Cir.1971) (per curiam).

In *Eleneki,* this court determined that because the door was "open," the knock and

---

**11.** Though the majority correctly points out that *Phillips* is "factually inapposite," majority at 27, 41 P.3d at 183 this recent case's reasoning and holding are highly apposite. Although the case did not involve the execution of a search war-

rant, Phillips alleged a violation of the knock and announce statute and, thus, the Ninth Circuit specifically analyzed the applicability of such requirements.

announce requirements did not apply. Nevertheless, the majority here asserts:

> At the point that Harada *opened* his door in response to the ruse, there was no breaking within the meaning of HRS § 803–37. However, a breaking occurred when Officer Bermudes used force to *prevent* Harada from *closing* the door. Consequently, the requirements of HRS § 803–37 were triggered, and the officers were required to declare their office, their business, and demand entrance.

Majority at 29–30, 41 P.3d at 185–86 (citations omitted) (emphases added). But the Ninth Circuit has expressly warned against requiring such "nonsensical procedure":

> [The officers] use of force to keep the door open, and to enter, did not implicate [the knock and announce requirements]. *Accord United States v. Salter,* 815 F.2d 1150, 1152 (7th Cir.1987). To rule otherwise would dictate a nonsensical procedure in which the officers, after having employed a permissible ruse to cause the door to be opened, must permit it to be shut by the occupants so that the officers could then knock, reannounce, and open the door forcibly if refused admittance.

*Contreras–Ceballos,* 999 F.2d at 435. What would be gained by demanding, as is required by the majority's insistence that the knock and announce statute applies, that the officers (1) permit the "open door" to be closed[12] and (2) re-knock, re-announce, and open the door forcibly if refused admittance (as surely would occur)? Under these circumstances, requiring the police to allow a defendant to close his door then to wait a reasonable period of time before breaking in would not further serve the purpose of the knock and announce rule. In an attempt to mitigate the senselessness of this nonsensical procedure, the majority introduces a new exception to the knock and announce rule—if any part of the requirement is "unreasonable" based on the "totality of the circumstances," it is eliminated. Majority at 29 n. 7, 41 P.3d at 185 n. 7. Thus, the majority asserts that officers need not wait for the door to close or for a reasonable amount of

time. *See id.* at 29, 41 P.3d 185. Applying the same exception to the case at bar, is it not unreasonable to require the officer to "orally demand entry," *id.* at 29, 41 P.3d 185, even though the officer has already announced, "Police. Search Warrant. Get on the ground." and is contemporaneously using force to prevent the door from being shut? Is there really any question that the officer who is pushing on the door and demanding Harada to "get on the ground" is effectively demanding entry? Does the majority believe that reciting the mantra, "we demand entry," has a magical effect that no other similar command possesses? If the majority believes that the "lawfulness of the execution of a search warrant should be judged under a standard of reasonableness," *id.* at 29 n. 7, 41 P.3d at 185 n. 7, why does it rigidly impose the straitjacket of intoning a specific catch-phrase, while rejecting functionally equivalent phrases different only in form? Does not the reasonableness analysis also apply to the officer's demanding entrance? If "[u]nder the circumstances described [in *Contreras Ceballos* ], it would be *unreasonable* to require the officers to wait," *id.* (emphasis in original), thereby eliminating that requirement, is it not, under the circumstances described in this case, also unreasonable to require the officer to orally demand entrance when he has effectively already done so, thereby eliminating that requirement? *Cf. Monay,* 85 Hawai'i at 285, 943 P.2d at 911 (Ramil, J., joined by Nakayama, J., concurring and dissenting) ("[The officers'] behavior taken as a whole, did translate into a demand for entry.... These actions were reasonable and realized the intent behind HRS § 803–37."). The majority, applying the knock and announce rule in this case, should apply all of the rule. It cannot freely pick and choose only those elements that it fancies.

Here, with respect to the first purpose of the knock and announce rule—reducing potential violence to both occupants and police resulting from an unannounced entry—not only are the occupants aware of the officers' desired entry, but also the threat of violence is not reduced by blindly adhering to the

---

12. Although the majority claims that, under its approach, officers need not wait for the door to close, the discussion in Section II demonstrates the two fatal flaws with this assertion.

knock and announce rule. Indeed, the potential for violence may actually increase by providing the occupant with additional time to rebuff the police's entry. Second, mandating that the officers allow the door to be closed before entering may actually increase the amount of unnecessary property damage because it practically guarantees that the door, at least, must be broken down. In contrast, if the officers are able to keep the door open by force, the damage to the door and other property will likely be lessened. Third, this court has already held that the occupant's right to privacy is minimal because (1) the occupant voluntarily opened his or her door to the outside world and (2) the only privacy interest in question is for the short "span of time between the announcement and the actual entry," *Dixon*, 83 Hawai'i at 23, 924 P.2d at 191. Accordingly, the majority should heed the earlier advice of this court: "The Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests." *Id.* at 22, 924 P.2d at 190 (quoting *Wilson v. Arkansas*, 514 U.S. 927, 934, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995)). Requiring compliance with the knock and announce rule in this case would be to insist on a formality, which has outlived its usefulness and may very well be counter to its original purpose.

In fact, the majority neglects to explain how requiring the officers in this case to orally demand entry—even putting aside the knock and announce requirement that the door be closed—would have further served the purpose of the rule. Does the majority believe that orally demanding entry in this case would be any different? Would it have actually advanced any of the three policy reasons in any way? The real-life result of the majority's position is that police officers will be rigidly required to recite the mantra, "Police, search warrant, we demand entry," even where, like this case, it serves no purpose.

Given that the majority recognizes the viability of *Eleneki*, *see* majority at 22–25, 41 P.3d at 178–81 the majority must agree that the door in this case is undoubtedly "open"

for purposes of the knock and announce rule. Once the door is opened, even if only partially, the purposes of the statute, as described earlier, have already been satisfied. The plain language of the statute supports such reading—it does not distinguish between "partially open" and "open." Rather, a door is either "open" or "shut." After all, despite what the majority suggests, one cannot "close" a door that is not "open." Similarly, a "breaking," even one by the majority, *see id.* at 26, 41 P.3d at 182, cannot occur on an already "open" door, *see* HRS § 803–37 ("If the doors, gates, or other bars to the entrance are *not* immediately *opened,* the officer may *break* them.") (emphases added). The majority focuses, instead, on when a "breaking" occurs, which is, in turn, defined as "where force is used to gain entry." *See* majority at 29, 41 P.3d at 185. But that merely begs the question of what it means to "gain entry." The ultimate question remains whether the three policy reasons underlying the statute are satisfied. Here, the officers "gained entry" when Harada voluntarily opened the door about three feet and Officer Bermudes entered. At that point, the three policies underlying the knock and announce statute had been achieved. After the door was "open" and entry had been "gained," the knock and announce requirements were no longer relevant, by both the terms of the statute and its underlying policies.

## IV. CONSTITUTIONAL REASONABLENESS

Granted, there are still concerns with the use of force, but such concerns are now properly addressed by the reasonableness standard secured by the state and federal constitutions. "[T]he standards by which any governmental search is to be judged is always its reasonableness, in light of the constitutional guarantee of freedom from unreasonable searches and seizures." *Monay,* 85 Hawai'i at 284, 943 P.2d at 910 (quoting *Garcia,* 77 Hawai'i at 467, 887 P.2d at 677) (citation omitted). As specified in *Dixon,* "[b]oth article I, section 7 of the Hawai'i Constitution and the fourth amendment to the United States Constitution provide for the right of the people to be secure in their

houses against unreasonable searches and seizures, and article I, section 7 additionally protects specifically against unreasonable invasions of privacy." 83 Hawai'i at 21–22, 924 P.2d at 189–90. The majority appears to believe that there are no other safeguards to protect a defendant's rights against unreasonable search and seizure other than the knock and announce statute. Indeed, if all one has is a knock and announce requirement, then any scenario concerning execution of a search or arrest warrant—even if the door is open (and entry has been gained)—seems to invoke such requirement. Thus, the majority sneaks this case, where the front door is already open, through the backdoor analysis of the knock and announce statute.

Rather, after the door is opened, the reasonableness standard—not the knock and announce requirements—applies. Of course, under some circumstances, the officers may well be required to announce their office and business, as entailed by the knock and announce statute. The reasonableness standard, however, does not incorrigibly demand a mechanistic and formulaic incantation to be recited, before using force on an already-opened door.

Here, I would hold that the officers' ruse entry and subsequent use of force were reasonable under the state and federal constitutions. The constitutional protections include the right of Harada to be secure in his house "against unreasonable searches and seizures" and "against unreasonable invasions of privacy." Dixon, 83 Hawai'i at 22, 924 P.2d at 190. Given that the officers had a valid search warrant, the privacy interest protected by the state and federal constitutions was "minimal" because "it is only the occupant's privacy for the span of time between the announcement and the actual entry that is implicated." Id. at 23, 924 P.2d at 191. The facts, as described by the majority, that (1) Harada was aware of the officers' presence outside his apartment, majority at 21, 41 P.3d at 177 and (2) Harada might destroy evidence, namely the narcotics, if given an opportunity to do so after closing his door, demonstrate that Officer Bermudes's use of force to keep the door open was reasonable.

In my view, the use of the appropriate reasonableness standard, rather than the now-irrelevant knock and announce statute, allows for an accurate analysis of the situation. As this court explained, quoting the United States Supreme Court, the knock and announce principle "is an element of the reasonableness inquiry under the fourth amendment." Dixon, 83 Hawai'i at 22, 924 P.2d at 190 (quoting Wilson, 514 U.S. at 934, 115 S.Ct. 1914); see also Richards v. Wisconsin, 520 U.S. 385, 387, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997). Thus, the knock and announce rule serves effectively as a proxy for reasonableness of the officers' gaining entry when the door is shut. But the knock and announce statute cannot be transformed into the sole, dispositive question in determining reasonableness in all cases, regardless of whether the door is shut. Here, the majority appears to believe that use of force on an open door is sufficient to invoke the knock and announce requirements, which relate to force on a shut door.

## V. CONCLUSION

Accordingly, I dissent—mindful of Justice Cardozo's admonition against the "tyranny of labels": the indiscriminate application of generalized legal principles to every and all potentially related cases, no matter how tenuous the connection, as a substitute for a well-considered application of the law as both written and intended by the legislature. Snyder v. Commonwealth, 291 U.S. 97, 114, 54 S.Ct. 330, 78 L.Ed. 674 (1934), overruled on other grounds by, Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

Opinion of ACOBA, J., concurring in part and dissenting in part.

The poorest man may in his cottage bid defiance to all the force of the Crown. It may be frail—its roof may shake—the wind may blow through it—the storm may enter, the rain may enter—but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!

Frank v. Maryland, 359 U.S. 360, 378–79, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959) (Douglas, J., dissenting) (quoting 15 Hansard, Parliamen-

*tary History of England (1753–1765),* at 1307), *overruled in part by Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). The sanctity of one's abode has been embedded in our common law traditions even before the origins of our nation. *See Payton v. New York,* 445 U.S. 573, 601, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (citation omitted). Protection for that sanctity is embodied in 1869 statutes now denominated as Hawai'i Revised Statutes (HRS) §§ 803–37 and 803–11 (1993). The majority departs from express mandates of those statutes. Therefore, I respectfully disagree with the import and reasoning of the majority opinion, and for the reasons stated, would affirm the order of the first circuit court (the court) granting suppression of the evidence, but on the ground that use of a ruse is not permitted under the express language and underlying policies of those statutes.

## I.

### A.

The relevant statute in this case, HRS § 803–37, states:

> **Power of officer serving.** The officer charged with the warrant, if a house, store, or other building is designated as the place to be searched, may enter it without demanding permission *if the officer finds it open. If the doors are shut* the officer must declare the officer's office and the officer's business, and demand entrance. If the doors, gates, or other bars to the entrance are not immediately opened, the officer may break them. When entered, the officer may demand that any other part of the house, or any closet, or other closed place in which the officer has reason to believe the property is concealed, may be opened for the officer's inspection, and if refused the officer may break them.

(Emphasis added.) "In interpreting statutes, the fundamental starting point is the language of the statute itself and where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning." *State v. Kalama,* 94 Hawai'i 60, 64, 8 P.3d 1224, 1228 (2000) (internal

quotation marks and citations omitted). In this case, "[n]one of the parties contend and [it can]not [be] discern[ed] that the language of HRS § [803–37] is ambiguous inasmuch as, on its face, there is no 'doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression.'" *Id.* (quoting *Citizens for Protection of North Kohala Coastline v. County of Hawai'i,* 91 Hawai'i 94, 107, 979 P.2d 1120, 1133 (1999) (internal quotation marks and citations omitted)). Thus, we must interpret HRS § 803–37, by "giv[ing] effect to the legislature's intent, which is obtained primarily from the language of the statute[.]" *Dines v. Pacific Ins. Co.,* 78 Hawai'i 325, 332, 893 P.2d 176, 183 (1995) (internal quotation marks, citation, and brackets omitted). *Cf. Kalama,* 94 Hawai'i at 65, 8 P.3d at 1229 ("It is how the statute would be read by the layperson [that] guides our construction in criminal cases.").

### B.

The statute is clear and unambiguous. On its face, HRS § 803–37 permits entry "without … permission" when serving a search warrant only "if the officer finds [the premises] open." It is without dispute that the officer here did not "find" the door to the premises open. "Find" in its ordinary and common sense meaning denotes "[t]o come upon," "[t]o discover," *Blacks Law Dictionary* 631 (6th ed.1990), or "to come upon often accidentally." *Merriam Webster's Collegiate Dictionary* 436 (10th ed.1993). The police did not "come upon" or "discover" the door open; they fomented the circumstances which caused it to be partially ajar. Hence, the police cannot be said to have found the door open within the meaning of HRS § 803–37. Under the statute, finding the door open is the *only* circumstance that permits the officer to "enter [the premises] without demanding permission." HRS § 803–37.

Because the police did not find the door open, but "shut," they were obligated to "'declare [the officer's] office and [the officer's] business, *and demand entrance.*'" *State v. Garcia,* 77 Hawai'i 461, 465, 887 P.2d 671, 675 (App.1995) (quoting *The King v. Ah Lou You,* 3 Haw. 393, 395 (1872)) (emphasis in original). The court's finding No. 9 "indis-

putably establish[ed] that the police failed to specifically 'demand entrance' as directed by the statute." *Id.* Thus, "[t]he police, here, having failed to follow the statute's mandate, illegally entered the premises. The entry being illegal, any items seized as a result of the illegal entry must be suppressed." *Id.* at 466, 887 P.2d at 676 (citation omitted).

Because HRS § 803–37 prescribes the manner in which search warrants are to be served, it is to be given paramount effect within the territorial boundaries of this jurisdiction. The statutes of our state admit of no other manner in which search warrants are to be served, thus *a fortiori* purported service in a manner other than that authorized by HRS § 803–37 is invalid, the entry illegal, and, thus, the fruits of the search tainted. By authorizing entry in two specific ways—upon finding the door open,[1] or if shut, then after the required pronouncements—the statute excludes all other manner of entry by those charged with serving a search warrant.

"[A] statute which provides for a thing to be done in a particular manner or by a prescribed person or tribunal implies that it shall not be done otherwise or by a different person or tribunal; and the maxim *expressio unius est exclusio alterius,* the express mention of one thing implies the exclusion of another, applies to such statute." *State ex rel. Battle v. Hereford,* 148 W.Va. 97, 133 S.E.2d 86, 90 (1963) (citations omitted). *See also Amantiad v. Odum,* 90 Hawai'i 152, 163, 977 P.2d 160, 171 (1999) (applying maxim of *expressio unius est exclusio alterius* to HRS § 386–73, stating that " 'original court action to settle controversies involving the workers' compensation law' " were precluded, and that the circuit court was relegated " 'to a secondary role' ") (quoting *Travelers Ins. Co. v. Hawai'i Roofing, Inc.,* 64 Haw. 380, 384, 641 P.2d 1333, 1336 (1982)); *Travelers Ins. Co.,* 64 Haw. at 387, 641 P.2d at 1338 (also applying maxim to HRS § 386–73, stating that

" 'appellant [may not] properly bring an original action in the circuit court which would bar the operative effect of [an administrative] order' ") (quoting *Ras v. Hasegawa,* 53 Haw. 640, 641, 500 P.2d 746, 747, *reh'g denied,* 53 Haw. 640, 500 P.2d 746 (1972)).

## II.

The exception to the statutory requirements allowed in our jurisdiction permits the police in executing a warrant to immediately enter the premises if exigent circumstances justify such an entry. HRS § 803–37 does not "prevent police executing a warrant from immediately entering the premises if exigent circumstances justify such an entry." *Garcia,* 77 Hawai'i at 469, 887 P.2d at 679 (citing *State v. Lloyd,* 61 Haw. 505, 512, 606 P.2d 913, 918 (1980)). The impetus for such action originates with the occupants and not with the police and is justified by objective evidence of a threat to life or the occupants' flight or their destruction of objects sought to be seized. *See State v. Davenport,* 55 Haw. 90, 99, 516 P.2d 65, 72 (1973) ("The court properly held that . . . the police had no choice but to effect a forced entry, since the alternative might well have been the destruction of the illicit drugs for which they were searching."); *cf. State v. Quesnel,* 79 Hawai'i 185, 189, 900 P.2d 182, 186 (App. 1995) (holding that contraband was seized in violation of HRS § 803–37, where officers had forcibly entered on the ground that "a search warrant had been previously executed at the residence, [and] there was a high probability that evidence[ ] may be destroyed if [they] did not enter immediately") (some brackets added and some deleted) (internal quotation marks omitted). This exception is not in derogation of, but is drawn in recognition of the policies embodied in HRS § 803–37. *See* discussion *infra.*

No relevant principle justifies a ruse to obtain entry.[2] In this case, the use of two plainclothes female officers was employed be-

---

1. The question of whether the police may simply enter premises that are "open" must be determined in the context of a specific case. However, the construction of terms such as "open" and "shut" in applying a statute such as HRS § 803–37, is an altogether different matter from sanctioning its circumvention.

2. A ruse is a "trick," *Webster's Third New Int'l Dictionary* 1990 (1961), "a wily subterfuge." *Merriam Webster's Collegiate Dictionary* 1026.

cause, according to the prosecution, the detective in charge "thought it would be more likely that the door would be opened under those circumstances." Obviously, then, no exigency existed. The ploy utilized was intended to entice the occupants to admit the police. Rather than comply with the statutory requirements applicable where a door is shut, the police sought to trick the occupants into opening the door without notifying them of their office or purpose or demanding entrance, a patent violation of HRS § 803–37.

### III.

A ruse undermines the inherent policies of HRS § 803–37 and circumvents the requirements of the statute. "The purpose of the knock-and-announce rule is to notify the person inside of the presence of the police and of the impending intrusion, give that person time to respond, avoid violence, and protect privacy as much as possible." *Garcia*, 77 Hawai'i at 468, 887 P.2d at 678 (internal quotation marks, citation, footnote, and brackets omitted). This is because " 'every householder, the good and the bad, the guilty and the innocent, is entitled to the protection designed to secure the common interest against unlawful invasion of the house.' " *Id.* at 468 n. 9, 887 P.2d at 678 n. 9 (quoting *Miller v. United States*, 357 U.S. 301, 313, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958)).

> "The basic premise of the prohibition against [unreasonable] searches was not protection against self-incrimination; it was the common law right of a [person] to privacy in his [or her] home, a right which is one of the indispensable ultimate essentials of our concept of civilization.... It belonged to all [persons], not merely to criminals[.]"

*Frank*, 359 U.S. at 377, 79 S.Ct. 804 (Douglas, J., dissenting). Additionally, " 'the rule of announcement [is], generally, to safeguard officers, who might be mistaken, upon an unannounced intrusion into a home, for someone with no right to be there.' " *Garcia*, 77 Hawai'i at 468 n. 9, 887 P.2d at 678 n. 9 (quoting *Sabbath v. United States*, 391 U.S. 585, 589, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968)).

A ruse gives no consideration to the occupant's privacy, for its purpose is to gain entry without the occupant's knowledge of the actual purpose for the intrusion. Under the stratagem employed, no thought is given to allowing an occupant time to respond to an official demand, inasmuch as an informed response is precluded. Likewise, the purpose of notifying residents of impending governmental intrusion is simply disregarded. Notification of the police presence becomes immaterial if the objective is to gain entry past unsuspecting residents.

When a ruse is employed, violence is not necessarily avoided. In the instant case, there was conflicting testimony about whether the police in fact announced their office before forcibly entering. What is undeniable is that an unsuccessful ruse in this case, as in *State v. Eleneki*, 92 Hawai'i 562, 993 P.2d 1191 (2000), *see infra* Section IV., resulted in the use of force by police to gain admittance. As the court said in finding No. 8, "Officer Bermudes used 'quite a bit' of force to open the door and had bruises all over his body the next day."

Moreover, surprise and confusion are likely to result at a resident's realization that entry is being made by someone who was not expected, or for some unknown purpose, engendering the risk of mistaking the identity of the intruder or the reason for the entry. None of the officers here were in uniform, the court observing in finding No. 5 that members of the "search team [were] dressed in plainclothes with HPD logo shirts or jackets [and that s]ome wore ski-masks[.]" A ruse is a practice pregnant with potential for tragic consequences and heightens the risk that "officers ... might be mistaken, upon an unannounced intrusion into a home, for someone with no right to be there." *Garcia*, 77 Hawai'i at 468 n. 9, 887 P.2d at 678 n. 9 (internal quotation marks and citation omitted).

The implications of sanctioning ruses in the execution of search warrants is far reaching. As this case demonstrates, the police will simply resort to a ruse and dispense with statutory requirements altogether to "make entry easier." With the shedding of such requirements, the purposes effectuated by a

prior notification requirement and the attendant exigent circumstances formulation become irrelevant.

## IV.

### A.

In circumstances similar to the present case, *Eleneki* departed from the plain language of HRS § 803–37 and its prior construction in *Garcia* and *Quesnel*, in holding that "the use of a ruse is not prohibited in the execution of a search warrant." *Eleneki*, 92 Hawai'i at 563, 993 P.2d at 1192. In *Eleneki*, the police, armed with a search warrant, made no attempt to comply with the requirements of HRS § 803–37 but instead "decided to employ a ruse to have the occupants open the door." *Id.* After several entreaties of, "Open the door, Ripper," one of the residents "opened the door approximately one foot." *Id.* The officer "then used some amount of force to further open the door as [an occupant] tried to close it." *Id.* According to the officer, "he simultaneously announced, 'Police, search warrant, we demand entry.'" *Id.*

Despite the plain language of HRS § 803–37, it was held that "the [Hawai'i] statutes are silent on the issue [of] whether the use of a ruse is permissible, [therefore] we look beyond the plain language of the statutes." *Id.* at 565–66, 993 P.2d at 1194–95. As related above, in mandating the methods by which search warrants are to be executed, the statute distinctly allowed service only in the manner stated. Under the facts in *Eleneki*, the police made no pretense of following the statute since they made no attempt to comply with it *before* effecting entry, but only recited the necessary announcements after having gained a foothold in the entrance.

In *Eleneki*, as in this case, the use of a ruse actually engendered the use of force between the police and the occupants, as those on the outside of the entrance attempted to expand the opening in the doorway, while another on the inside attempted to close it. Inexplicably, it was said in *Eleneki* that " '[r]use entries such as that in the present case lack the element of surprise, thereby reducing the chance of confrontation,' " *id.* at 566, 993 P.2d at 1195 (quoting *State v. Dixon*, 83 Hawai'i 13, 22–23, 924 P.2d 181, 190–91 (1996)) (internal quotation marks and citation omitted), when in truth, the facts recounted in *Eleneki* were that a confrontation did take place. Moreover, the view expressed in *Eleneki* that " 'the occupant's right of privacy is severely limited where the police have satisfied the Fourth Amendment's probable cause and warrant requirements' " merely begs the question. *Id.* (quoting *Dixon*, 83 Hawai'i at 23, 924 P.2d at 191) (internal quotation marks and citation omitted). *Cf. Payton*, 445 U.S. at 589, 100 S.Ct. 1371 ("To be arrested in the home . . . [is] an invasion of the sanctity of the home[, which] is simply too substantial an invasion to allow without a warrant, in the absence of exigent circumstances, *even when it is accomplished under statutory authority and when probable cause is clearly present.*" (Emphasis added.)).

For inherent in an analysis of our constitution's counterpart[3] of the Fourth Amendment is the premise that the *execution* of a search warrant must be reasonable, inasmuch as an unreasonable execution of a warrant, even if that warrant satisfies "probable cause and warrant requirements," will invalidate the subsequent search and the fruits thereby obtained. *See Wilson v. Arkansas*, 514 U.S. 927, 934, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995) (stating that "[g]iven the longstanding common-law endorsement of the practice of announcement, . . . the method of an officer's entry into a dwelling [is] among the factors to be considered in assessing the reasonableness of a search or seizure," and that "in some circumstances an officer's unannounced entry into a home

3. Article 1, § 7 of the Hawai'i Constitution states that

[t]he right of the people to be secure in their persons, houses, papers and effects *against unreasonable searches, seizures and invasions of privacy* shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

(Emphasis added.)

might be unreasonable under the Fourth Amendment").

The rationale adopted in *Eleneki* led to the tortured conclusion that the requirements of HRS § 803–37 had been met in that case. It was said that

> the officers employed a permissible ruse, which induced [an occupant] to open the door approximately one foot. *This was sufficient to render the door "open" for purposes of the statute.* Therefore, the officers were not required to knock and announce before entering, and the force used by the officers to further open the door against [that occupant]'s resistance was not a breaking.

*Eleneki,* 92 Hawai'i at 566–67, 993 P.2d at 1195–96 (emphasis added). The language of HRS § 803–37 is manifestly to the contrary. HRS § 803–37 pronouncements may be forborne "if the officer[s] find [the premises] open." Obviously, the officers did not "find it open"; they tricked the occupants into partially opening the door. *Had the police found the door open, there would have been no reason to employ a ruse to have it opened.* The federal cases cited in *Eleneki* were inapposite. They applied a statute that rendered no direction at all as to the appropriate conduct of the law enforcement officers in the event the door was found "open" or not and is less solicitous of the privacy rights of occupants than HRS § 803–37.[4]

#### B.

In applying HRS § 803–37, *Eleneki* adopted the rationale applied in *Dixon* to HRS § 803–11, the statute pertaining to service of arrest warrants. In *Dixon,* the defendant was the subject of an outstanding arrest warrant. Using the hotel's security guard to obtain entry to defendant's hotel room on the pretense of "check[ing] on the air conditioning," 83 Hawai'i at 15, 924 P.2d at 183, the police entered and arrested defen-

dant. In moving to suppress evidence obtained at the time of arrest, the defendant maintained that HRS § 803–11 was violated. HRS § 803–11 provides as follows:

> **Entering house to arrest.** Whenever it is necessary to enter a house to arrest an offender, and *entrance is refused, the officer or person making the arrest* may force an entrance by breaking doors or other barriers. But before breaking any door, the officer or person shall first demand entrance in a loud voice, and state that the officer or person is the bearer of a warrant of arrest; or if it is a case in which arrest is lawful without warrant, the officer or person shall substantially state that information in an audible voice.

(Emphasis added.)

The language employed is plain and unambiguous. On its face, HRS § 803–11 concerns "enter[ing]" a house to [make an] arrest" and, thus, is directed at "the officer or person making the arrest." *Dixon,* 83 Hawai'i at 15–16, 924 P.2d at 183–84. Hence, the words "entrance is refused" relate to the person so affected, that is, "the officer or person" who finds "it . . . necessary to enter a house to arrest an offender." *Id.* It is the officer or person making the arrest, then, who is empowered to enter for that purpose and who, as the words "entrance is refused" indicate, *id.,* must first request entry.

Because, as stated in the statute, authorization to request entry is given "to [make] an arrest," the entry requested must be for that purpose. *Id.* The statute does not contemplate that the request to enter a house for the purpose of arrest be on any other ground; *a fortiori,* entry is authorized only upon a request to make an arrest. *HRS § 803–11, then, does not permit any person except one acting in the capacity described, to enter other than upon a request to make an arrest. Because the statute does not au-*

---

4. 18 U.S.C. § 3109 (1985), the statute referred to in *Eleneki,* states as follows:

> **§ 3109. Breaking doors or windows for entry or exit.**
> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his [or her]

authority and purpose, he [or she] is refused admittance or when necessary to liberate himself [or herself] or a person aiding him [or her] in the execution of the warrant.

HRS § 803–37 is more protective of the privacy interest of occupants of a place, affirmatively requiring that the police demand entrance. *See Garcia,* 77 Hawai'i at 466, 887 P.2d at 676.

*thorize any other manner of serving an arrest warrant, it forecloses the use of a ruse that masks the true purpose of the request to enter.*

Despite the clear language of HRS § 803–11, from which legislative intent is to be determined, *Dixon* relied on federal decisions under 18 U.S.C. § 3109 pertaining to search warrants and other state decisions, a course at odds with our duty to apply the plain language of our *own* statute. In arriving at the conclusion that "HRS § 803–11 is not implicated where entry is gained through an open door without use of force," *Dixon*, 83 Hawai'i at 21, 924 P.2d at 189, this court rendered HRS § 803–11 a nullity. *See infra* Part VII. In executing warrants, the police now need only resort to a ruse to obtain entry, a practice verified by *Dixon, Eleneki*, and the majority opinion in this case. *Dixon* went even further, in an analysis paying little heed to constitutional considerations of privacy in the execution of a warrant, a matter discussed *infra* in Part X.

## V.

We are not faced with exigent circumstances in a situation where the police lacked a warrant. Here the police officers had a warrant; the exigent circumstances rule in that situation is applied for the purpose of excusing officers' adherence to the announcements required before entry, *see State v. Balberdi*, 90 Hawai'i 16, 21, 975 P.2d 773, 778 (App.1999), and the constitutional mandate that they afford an occupant a reasonable time to respond to a demand for entry. *See Garcia*, 77 Hawai'i at 467, 887 P.2d at 677 (holding that article I, § 7 of the Hawai'i Constitution's mandate that search be reasonable requires officers to afford the occupants of the premises a reasonable time to respond to their announcement). Accordingly, the relevant exigent circumstances overriding constitutional and statutory mandates are those occurring *prior* to entry. Here, there were no exigent circumstances justifying an abandonment of the requirements set down in *Garcia*.

The so called "exigent circumstances" asserted by the prosecution originated not in the actions of the defendants, but in the failure of the police's own ruse. The police cannot justify entry by creating their own exigency. For example, in *State v. Barnett*, 68 Haw. 32, 703 P.2d 680 (1985), the fact that the police knew a defendant was aware of their presence and had told her what they were looking for did not create an exigency to justify entry without a warrant.

> At most, these facts may have led the police to assume that evidence would not be secure while a warrant was obtained. However, more than this is required [for exigent circumstances].... "[T]he mere subjective belief of the police that evidence is in imminent danger of removal or destruction is never enough as a basis for a finding of exigent circumstances."

*Id.* at 36, 703 P.2d at 683 (quoting *State v. Dorson*, 62 Haw. 377, 386, 615 P.2d 740, 747 (1980)). Moreover, it was pointed out that "nowhere do the findings contain 'specific and articulable facts from which it may be determined that the action [the police] took was necessitated by the exigencies of the situation.' " *Id.* (quoting *Dorson*, 62 Haw. at 388, 615 P.2d at 748 and *State v. Dias*, 62 Haw. 52, 57, 609 P.2d 637, 640–41 (1980)).

The correct application of the exigent circumstances rule in that circumstance where the police are executing a warrant rests on the police's objectively supported belief that unforeseen circumstances have arisen justifying immediate entry. *See Quesnel*, 79 Hawai'i at 192, 900 P.2d at 189. The record of the instant case is totally devoid of any officer's belief that exigent circumstances justified the entry, *inasmuch as such a claim would be logically inconsistent and factually inaccurate in the face of the officers' own testimony that they gained partial entry by way of a ruse and completed entry by use of force.*

To the credit of the police witnesses, they did not engage in an "exigent circumstances" subterfuge. Nor did the trial court in its findings depart from the facts presented to it, that is, that the officers used force to gain entry after a failed ruse, and not because of exigent circumstances. The majority opinion does not adopt the prosecution's position that the exigent circumstances circumstance

should apply in this case, apparently because to apply it, as the defense contends, would be a significant departure from the precedent of *State v. Rodrigues*, 67 Haw. 496, 692 P.2d 1156 (1985), where it was held that a claim of exigent circumstances not raised below by the prosecution in a suppression case is waived.[5] Nevertheless, despite the lack of any basis in the record, the majority holds out the possibility that, absent waiver, the doctrine of exigent circumstances may apply in this case.

## VI.

There is no "knock and announce" rule pertinent to our jurisdiction except as set forth in HRS §§ 803–11 and 803–37. Our knock and announce statute differs from the federal knock and announce statute, *see Garcia*, 77 Hawai'i at 466, 887 P.2d at 676 ("the third requirement of 18 U.S.C. section 3109 is clearly different from that of HRS section 803–37 which affirmatively requires that the police demand entrance"), and is unique in its express and explicitly-directed tripartite requirements. There is nothing to be gained, then, in consulting case law from other jurisdictions, as did *Eleneki* and *Dixon*, except perhaps as the statutes themselves may contravene the federal constitution or our own constitution. *See Garcia*, 77 Hawai'i at 467, 887 P.2d at 677 (referring to Illinois cases in determining that under article I, § 7 of the Hawai'i Constitution, reasonableness of search involves judgment of whether occupants were given reasonable amount of time to respond to a demand for entry).

Hence, the decisions have deviated from the true path established in the venerable 1869 statutes and strayed into the mire of fictional "breaking," *Dixon*, 83 Hawai'i at 21, 924 P.2d at 189; "permissible ruse[s]," *Eleneki*, 92 Hawai'i at 566, 993 P.2d at 1195; and partially opened doors, *see id.* Sight of

the objectives of HRS §§ 803–11 and 803–37—that they serve as a limitation on the conduct of police officers in executing warrants in order to effectuate the purposes discussed *supra* at 42–43, 41 P.3d at 198–99 at the core of which is the policy favoring privacy—is lost. For "[a]ny official intrusion is necessarily an invasion of privacy, and the sanctity of the home is jealously guarded by the law." *State v. Richardson*, 80 Hawai'i 1, 4, 904 P.2d 886, 889 (1995).

## VII.

Thus, there are compelling reasons for overruling *Dixon* and *Eleneki*. The rules announced in those cases conflict with unambiguous statutory language and defy conceptual and practical workability. *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 854–55, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (stating that "when th[e c]ourt reexamines a prior holding, ... [it] may ask whether the rule has proven to be intolerable simply in defying practical workability") (citing *Swift & Co. v. Wickham*, 382 U.S. 111, 116, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965)); *Allied–Signal, Inc. v. Director, Div. of Taxation*, 504 U.S. 768, 783, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992) ("In deciding whether to depart from a prior decision, one relevant consideration is ... whether it is 'unworkable in practice.'" (Quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546, 105 S.Ct. 1005, 83 L.Ed.2d 1016, (1985).)).

Quite plainly, *Dixon* and *Eleneki* violated established rules of statutory construction. As mentioned, HRS §§ 803–11 and 803–37 are not ambiguous; therefore, they should have been applied according to their plain meaning. *See supra* pages 41, 45–46, 41 P.3d pages 197, 201–02. HRS §§ 803–11 and 803–37 specifically set forth the manner in which

---

**5.** Plaintiff–Appellant State of Hawai'i (the prosecution) did not raise the question of exigent circumstances at the motion to suppress and does so for the first time on appeal. In *Rodrigues*, a review of the record revealed that at the trial level the prosecution had not presented the issue of exigent circumstances, nor the issue of a "good faith" exception to the exclusionary rule. This court ruled that, "[n]othing in the record even hints that the [prosecution] was ... relying on a finding of exigent circumstances to justify the warrantless search and seizure, or on a 'good faith' exception theory.... [W]e deem the issues of exigency and a 'good faith' exception to have been waived." 67 Haw. at 498, 692 P.2d at 1158 (citing *State v. Miyazaki*, 64 Haw. 611, 616, 645 P.2d 1340, 1344 (1982); *State v. Hook*, 60 Haw. 197, 204, 587 P.2d 1224, 1229 (1978)). Accordingly, that issue was waived. *See id.*

arrest and search warrants are to be executed and on their faces do not admit of service in any other way, absent, as we have held, exigent circumstances. *See supra* pages 41–42, 45–46, 41 P.3d pages 197–98, 201–02. The maxim of *expressio unius est exclusio alterius* applies, but was ignored in both *Dixon* and *Eleneki. See supra* page 42, 41 P.3d page 198. Rather than adhere to such rules of construction, *Dixon* and *Eleneki* looked to foreign statutes and precedent, setting this court on a wayward journey far from the prescriptions and historical underpinnings of our own statutes.

At their crux, *Dixon* and *Eleneki* contradict each other. *Dixon* held that a "ruse to effect [a] voluntary opening of the door, through which the officers enter *without any use of force ... [is not] a breaking requiring compliance with the knock and announce requirements* of HRS § 803–11." 83 Hawai'i at 21, 924 P.2d at 189 (emphasis added). *Eleneki* held, in direct contradiction to *Dixon* that, in employing a ruse, "the officers were not required to knock and announce before entering and the *force used by the officers to further open the door against [the occupant's] resistance was not a breaking*" requiring the compliance with the knock and announce principles under HRS § 803–37.[6] 92 Hawai'i at 566–67, 993 P.2d at 1195–96 (emphasis added). If *Dixon* is a correct statement of the law, then *Eleneki* should be overruled. If *Eleneki* is a correct statement of the law, then *Dixon* should be overruled. It is not a question of "inadvertence" for they cannot in principle coexist. For the reasons I have espoused, neither, in my view, is a correct statement of the law, but evidence of the grave error in judicial statutory construction originating in *Dixon* and amplified in *Eleneki.*

*Dixon* and *Eleneki* subvert the language and purposes of HRS §§ 803–11 and 803–37. This can no longer be doubted. What was not considered in those cases, but is presented here and supports their overruling, is the now established fact that HRS §§ 803–11 and 803–37 have been largely abrogated by those decisions. Resting on the *Dixon* formulation, the police may now completely circumvent the requirements of those statutes by use of a ruse, as the officer in the instant case related, to "make entry easier."

If the requirements of the statutes are not followed, the purposes they serve are nullified. Thus, in construing these statutes to permit ruses, the majority has effected a judicial repeal of them, a violation of our obligation and our separate function as the third branch of government to avoid such a result. *See Potter v. Hawai'i Newspaper Agency,* 89 Hawai'i 411, 422, 974 P.2d 51, 62–63 (1999) ("Our rules of statutory construction require us to reject an interpretation of a statute that renders any part of the statutory language a nullity." (Citations omitted)); *Konno v. County of Hawai'i,* 85 Hawai'i 61, 71, 937 P.2d 397, 407 (1997) (" '[S]tatutory construction dictates that an interpreting court should not fashion a construction of statutory text that effectively renders the statute a nullity or creates an absurd or unjust result.' ") (Quoting *Dines,* 78 Hawai'i at 337, 893 P.2d at 188 (Ramil, J., dissenting.) (Citation omitted.)); *Levy v. Kimball,* 51 Haw. 540, 545, 465 P.2d 580, 583 (1970) ("In the construction of a statute the general law is that a statute should be so interpreted to give it effect; and we must start with the presumption that our legislature intended to enact an effective law, and it is not to be presumed that legislation is a vain effort, or a nullity." (Citations omitted.)); *State v. Isomura,* 9 Haw.App. 333, 341, 839 P.2d 1186, 1190 (1992) ("[a] statute should be interpreted to give it effect and to avoid a construction that would render it a vain legislative effort or a nullity." (Citation omitted.)).

In light of the foregoing, the justifications for overruling *Dixon* and *Eleneki* are far more than compelling. *See State v. Garcia,* 96 Hawai'i 200, 206, 29 P.3d 919, 924–25 (2001) ("[A] court should 'not depart from the doctrine of stare decisis without some com-

---

**6.** HRS §§ 803–11 and 803–37 have been viewed as essentially the same. *See Eleneki,* 92 Hawai'i at 565, 993 P.2d at 1194 ("Although the language of HRS §§ 803–11 and 803–37 differs, the purposes of the 'knock and announce rule' are identical in each context and the use of a ruse is also consistent with those purposes in the execution of a search warrant.")

pelling justification.'" (Quoting *Hilton v. South Carolina Pub. Ry. Comm'n*, 502 U.S. 197, 202, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991).) (Emphasis omitted.)).

## VIII.

As this case illustrates, the refusal to apply the statute as written only perpetuates the fruitless search for some unifying proposition. The majority's holding that, in a ruse, the HRS § 803–37 pronouncements are triggered if officers use force to force entry, *see* majority opinion at 20, 41 P.3d at 176 is lacking in principled basis. Indeed, such a rule has been found objectionable. *See, e.g., State v. Reynaga*, 129 N.M. 257, 5 P.3d 579, 582 (Ct.App.2000) (2000) (holding in suppressing evidence recovered that, where police used force following a ruse to gain entry into a mobile home, that "for a ruse to be a reasonable and constitutional alternative to knocking and announcing, the State must demonstrate that, at the time of the execution of the warrant, ... that exigent circumstances exist[ed]" (citation omitted)); *Commonwealth v. Martinelli*, 729 A.2d 628, 630 (Pa.Super.Ct.1999) (suppressing evidence from search warrant execution where police used a ruse to encourage the defendant to open the door slightly, and pushed open the door while simultaneously announcing, "[P]olice, search warrant," because "[t]he purpose of the 'knock and announce' rule[,] to prevent violence, ... protect an occupant's privacy expectation, ... and to prevent property damage ... may be achieved only if the police officer awaits a response for a reasonable period of time after his [or her] announcement of identity, authority, and purpose"); *Commonwealth v. Ceriani*, 411 Pa.Super. 96, 600 A.2d 1282, 1287–89 (Pa.Super.Ct.1991) (holding that police acted unreasonably by using a ruse to encourage the opening of a door and thereafter "announcing their authority and purpose simultaneously with their entry" as they "forced their way" into the residence; and explaining that "[b]alancing the benefits of deterring police misconduct against the cost of excluding otherwise reliable evidence" resulted in the determination that the evidence recovered during the warrant execution should have been suppressed); *State v. Ellis*, 21 Wash.App. 123, 584 P.2d 428 (1978) (holding that, absent exigent circumstances, "where a ruse is unsuccessfully employed in an attempt to gain entry, the 'knock and wait' rule must be observed [and that t]he officer must announce his [or her] true identity and purpose and be refused admission before he [or she] may enter by force").

The requirements of HRS § 803–37 have nothing to do with the use of force, once entry of any degree has been made. As Justice Ramil points out in his dissenting opinion, the pronouncements mandated are a *prerequisite* to entry. By their terms, such pronouncements are intended to notify the occupants of an impending intrusion and to afford the occupants the opportunity to open the door, *see Garcia*, 77 Hawai'i at 468, 887 P.2d at 678; hence, the requirement that the officer must first *"demand entrance," id.* at 466, 887 P.2d at 676 (emphasis added), when the door is shut.

Once entry of any degree is made in a ruse, the interests sought to be protected by such pronouncements are dissipated and are no longer served by a post-entry rendition of HRS § 803–37 announcements. With all due respect, the holding in this case is a perverse application of the statutory knock and announce requirements which were intended not to legitimize ruses gone awry, but to condition government intrusion in the first place.

## IX.

It should be evident from the foregoing that an issue of constitutional dimension as to HRS §§ 803–11 and 37 is posed only if their application runs afoul of a constitutional prohibition. *See Garcia*, 77 Hawai'i at 467, 887 P.2d at 677 (holding that HRS § 803–37 "violates the Hawai'i Constitution to the extent that it permits the police to break into the place to be searched if 'bars' to their entrance are not immediately opened."). Otherwise, applying canons of statutory construction, they must be applied as written.

Of course, higher standards may be imposed by the legislature pursuant to statute, than under a constitutional provision. *See, e.g., In re Grand Jury Subpoena Duces Te-*

*cum Served on the Museum of Modern Art,* 93 N.Y.2d 729, 697 N.Y.S.2d 538, 719 N.E.2d 897, 903–04 (1999) (determining that a state statute prohibiting seizures of art on loan to museums was applicable to a grand jury subpoena and did not implicate the Fourth Amendment's reasonableness requirements, because the statute was "broader than the constitutional concerns of unreasonable seizures[, and, t]hus, although the subpoena may pass constitutional muster, the statute stands in its way"). Therefore, when a legislature enacts a statute that provides more protection than does a constitution, the court is bound to construe the statute, as written, as the constitution is no longer implicated. *See id.* (stating that interpretation of a statute providing broader protection than the federal and state constitution does not implicate those provisions, and "[t]he analysis necessary to resolve this case is not of a constitutional dimension"). Because our knock and announce statutes do not offend either the federal or state constitutions, this court's duty is to adhere to the plain meaning of the statute, otherwise, we encroach on legislative authority. "[N]either the courts nor the administrative agencies are empowered to rewrite statutes to suit their notions of sound public policy when the legislature has clearly and unambiguously spoken." 1 N. Singer, *Sutherland Statutory Construction* § 3.06, at 55 (5th ed.1992–94).

Thus, the constitutional impact of ruses becomes an issue only because *Dixon, Eleneki,* and the majority in this case permit the circumvention of service requirements by sanctioning ruses. Assuming *arguendo* that the requirements of HRS §§ 803–11 and –37 may be cast aside, *Dixon's* own analysis is inherently faulty in at least two ways.

## X.

As noted previously, *Dixon* found little constitutional impediment to ruses. However, in contrast to the United States Constitution, the right against unreasonable searches and invasions of privacy is expressly confirmed in article I, § 7 of the Hawai'i Constitution. In light of that expression, we have construed our provision as affording broader protection to persons in our state than might

be recognized by United States Supreme Court and federal court decisions construing the prohibition against unreasonable searches and an implied right of privacy in the federal constitution. *See* cases cited *infra* Part X.C.

*Dixon's* trivialization of the Hawai'i Constitution's right to privacy as "minimal," in the context of governmental entries into the home, finds no support in prior case law or the history of section 7 and is based on two untenable grounds: (1) that "[t]he privacy interest protected by the knock and announce rule is minimal, inasmuch as it is only the occupant's privacy for the span of time between the announcement and the actual entry that is implicated," 83 Hawai'i at 23, 924 P.2d at 191, and (2) that "[w]here the entry is obtained by ruse, there is no unwarranted intrusion on the occupant's privacy because the occupant has voluntarily surrendered his or her privacy by opening the door." *Id.*

The right to privacy implicated transcends "the span of time between the announcement and the actual entry." *Id.* The privacy interest involved is that expectation against government intrusion in one's own place of abode that society recognizes as reasonable. "[T]he home [is] the situs of privacy." *Mallan,* 86 Hawai'i at 444, 950 P.2d at 183 (emphasis omitted). *See also State v. Apo,* 82 Hawai'i 394, 401, 922 P.2d 1007, 1014 (App. 1996) (holding that police officer's entry into the living room constituted a " 'search' in the constitutional sense," because the officer invaded defendant's legitimate expectation of privacy in his home (citation omitted)).

### A.

What *Dixon* mistook for a minimal privacy interest was in fact that constitutional rule of reasonableness *in the execution of a warrant* imposed on officers to afford a reasonable time for the occupant to respond after their announcement and before entry:

[T]he amount of time allowed to lapse between announcement and entry is relevant in determining the reasonableness of the officers' conduct in executing a search warrant. It follows, then, that a person

should be afforded sufficient opportunity to respond to authority before a forcible entry is made. Thus, even where the operative statute does not require the officers to demand entrance, a reasonable amount of time to respond must be given to the occupants. Hence, one commentator has summed up the rule as follows: "An officer must wait a reasonable period of time before he or she may break and enter into the premises to be searched. That is, the occupant must be given a reasonable opportunity to surrender his or her privacy voluntarily." 2 W.Lafave *Search and Seizure* § 4.8(c), at 278 (1987) (footnote omitted).

*Garcia*, 77 Hawai'i at 467, 887 P.2d at 677 (some internal quotation marks and citations omitted) (brackets, ellipsis points, and footnote omitted). In our state, absent exigent circumstances, the officers must afford the occupants of the premises "a reasonable time," *id.* at 468, 887 P.2d at 678, to respond to their announcement before making a forced entry. Otherwise, the "request for entry is meaningless." *Quesnel*, 79 Hawai'i at 190, 900 P.2d at 187 (internal quotation marks and citation omitted). Hence, the point from which the occupants would know it was the police demanding entrance, as opposed to other persons, as measured from the time the police announced their office and business, is not a gauge of the privacy interest involved, but a standard governing police execution of a warrant. *See id.* at 191, 900 P.2d at 188.

### B.

The second *Dixon* ground is an incongruous application of the words "voluntary surrender." In its ordinary sense, "[t]he word ['voluntary'] . . . often implies knowledge of essential facts." *Black's Law Dictionary* at 1575. Voluntary also means "proceeding from the will or from one's own choice or consent." *Merriam Webster's Collegiate Dictionary* at 1324. The mere opening of the door cannot be deemed voluntary in any fair sense because, as the facts in *Dixon* showed, the occupants were misinformed as to the reason for requesting entry. Under a ruse, the essential facts are hidden from the occupants, thus it cannot be said justly that they acted "from [their] *own* choice or consent." *Id.* (emphasis added). "Surrender" denotes "yield[ing] to the power, control, or possession of another upon compulsion or demand . . . or [to] agree to forgo esp[ecially] in favor of another." *Id.* at 1186. Obviously, there cannot be a "true" surrender where the actor does not actually know what he or she has agreed to forego or to whom. Of course, it is arguable whether one who has either not completely opened the door, as the court found in this case, or attempts to close a partially opened door, can reasonably be said to have "voluntarily surrendered" his or her right to privacy.

### C.

Any construction of article I, section 7, as was undertaken in *Dixon*, must be made in light of the fact that we have decided it provides for greater protection from unreasonable searches and seizures than does the federal constitution, *see State v. Mallan*, 86 Hawai'i 440, 448, 950 P.2d 178, 186 (1998) (stating that, " '[a]s the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution, we are free to give broader privacy protection than that given by the federal constitution,' " and that "unlike the federal constitution, our state constitution contains a specific provision expressly establishing the right to privacy as a constitutional right" (quoting *State v. Kam*, 69 Haw. 483, 491, 748 P.2d 372, 377 (1988))) (emphasis omitted); *State v. Navas*, 81 Hawai'i 113, 123, 913 P.2d 39, 49 (1996) (explaining that article I, section 7 affords a "more extensive right of privacy" than that of the United States Constitution); *State v. Lopez*, 78 Hawai'i 433, 445, 896 P.2d 889, 901 (1995) ("In the area of searches and seizures under article I, section 7, we have often exercised th[e] freedom" to "provide broader protection under our state constitution."); *State v. Enos*, 68 Haw. 509, 511, 720 P.2d 1012, 1014 (1986); *State v. Tanaka*, 67 Haw. 658, 661–62, 701 P.2d 1274, 1276 (1985) ("In our view, article I, § 7 of the Hawai'i Constitution recognizes an expectation of privacy beyond the parallel provisions in the Federal Bill of Rights."); *State v. Kaluna*, 55 Haw. 361, 369–70 n. 6, 520 P.2d 51, 58–59 n. 6

(1974); *State v. Hanson,* 97 Hawai'i 77, 82, 34 P.3d 7, 12 (App.2001), *affirmed by,* 97 Hawai'i 71, 34 P.3d 1 (2001) ("The Hawai'i Supreme Court has concluded that a person's expectation of privacy under article 1, § 7 of the Hawai'i Constitution is greater than that under the fourth amendment to the United States Constitution." (Citation omitted.)), and in consideration of the protection expressly provided for against invasions of privacy, *see Lopez,* 78 Hawai'i at 446, 896 P.2d at 902 ("[U]nlike its federal counterpart, article I, section 7, specifically protects against 'invasions of privacy.'" (Citation omitted.)); *State v. Vinuya,* 96 Hawai'i 472, 484, 32 P.3d 116, 128 (App.2001) ("[W]e have not hesitated to extend the protections afforded under article I, section 7 of the Hawai'i State Constitution beyond those available under the cognate Fourth Amendment to the United States Constitution when logic and a sound regard for the purposes of those protections have so warranted." (Internal quotation marks and citations omitted.)). With due regard for the majority position, the analysis employed in *Dixon, see supra* Part X.A. &

B., is bereft of such principles. In deciding the applicability of article I, section 7 to this case, any analysis must be rooted in our long held view of the protection it affords the people of our state. It is, after all, intrusion by *government* that we are concerned with, not simply the act of opening a door.

## XI.

The conduct of police officers in executing warrants is circumscribed by our state statutes. To uphold the use of ruses in the circumstances presented by the cases discussed contravenes such limitations. In a world that tolerates such ruses, a person can never be certain for whom or for what purpose he or she has opened the door.