96 P.3d 603

STATE of Hawai'i, Plaintiff–Appellee,

v.

Henry AUL, III, aka Hank Aul, Defendant–Appellant.

Nos. 25433, 25434, 25435.

Intermediate Court of Appeals of Hawai'i.

July 30, 2004.

As Amended Aug. 11, 2004.

Jennifer S. Winn, Deputy Prosecuting Attorney, County of Kauai, on the briefs, for Plaintiff–Appellee.

Edward K. Harada, Deputy Public Defender, on the briefs, for Defendant–Appellant.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by BURNS, C.J.

After a June 10, 2002 jury-waived trial of three FC–Criminal cases, Judge Calvin K. Murashige entered a judgment in each case on October 7, 2002. On October 29, 2002, Defendant–Appellant Henry Aul, III, aka Hank Aul (Defendant or Aul), filed a notice of appeal in each case.[1] The three appeals, Nos. 25433, 25434, and 25435, were consolidated under No. 25433. In the opening brief, Aul, in the points of error, challenges parts of the October 7, 2002 Judgments appealed from in Nos. 25434 and 25435, but does not challenge any part of the October 7, 2002 Judgment appealed from in No. 25433.

With the counts challenged in each appeal printed in bold, the charges and the results were as follows:

*No. 25433 (FC–CR No. 02–1–0016)*

Count 1: January 28, 2002, Abuse of Family and Household Members, Hawai'i Revised Statutes (HRS) § 709–906 (Supp. 2003).[2]

Aul was convicted and sentenced to two years of probation, committed to the Kauai Community Correctional Center (KCCC) for forty-eight hours, required to pay $50 to the Crime Victim Compensation Special Fund and a $150 probation fee, and ordered to successfully complete the Alternatives to Violence Program.

---

1. In each of the three cases, the court filed an Amended Judgment on November 7, 2002 that amended the October 7, 2002 Judgment to correct the date on which Defendant was required to appear at a proof of compliance hearing from June 3, 2002 to June 3, 2003.

2. Hawai'i Revised Statutes (HRS) § 709–906 (Supp.2003) states, in relevant part, as follows:

**Abuse of family or household members; penalty.** (1) It shall be unlawful for any person, singly or in concert, to physically abuse a family or household member or to refuse compliance with the lawful order of a police officer under subsection (4). The police, in investigating any complaint of abuse of a family or household member, upon request, may transport the abused person to a hospital or safe shelter.

*No. 25434 (FC–CR No. 02–1–0021)*

Count 1: January 26, 2002, Violation of an Order for Protection, HRS § 586–11.[3]

Count 2: January 29, 2002, Violation of an Order for Protection, HRS § 586–11.

**Count 3: January 30, 2002, Violation of an Order for Protection, HRS § 586–11.**

Count 4: January 29, 2002, Abuse of Family and Household Members, HRS § 709–906 on January 29, 2002.

Aul was acquitted of Counts 1 and 2, convicted of Counts 3 and 4, and sentenced to two years of probation, committed to KCCC for forty-eight hours (to run concurrently with the sentence imposed in FC–CR No. 02–1–0016), required to make an additional payment of $50 to the Crime Victim Compensation Special Fund, and ordered to successfully complete the Alternatives to Violence Program.

*No. 25435 (FC–CR No. 02–1–0057)*

Count 1: Sometime between January 28, 2002 through February 18, 2002, Violation of an Order for Protection, HRS § 586–11.

**Count 2: April 2, 2002 Criminal Contempt of Court, HRS § 710–1077(1)(g).[4]**

Aul was convicted as charged and sentenced to two years of probation, committed to KCCC for forty-eight hours (to run concurrently with the sentence imposed in FC–CR No. 02–1–0016 and FC–CR No. 02–1–0021), required to make an additional payment of $50 to the Crime Victim Compensation Special Fund, and ordered to success-

fully complete the Alternatives to Violence Program.

## POINTS ON APPEAL

Aul argues that "the trial court erred in convicting [Aul] of the offense of violating an order of protection under HRS § 586–11 in Count 3 of *No. 25434,* and the court also erred in convicting [Aul] of Criminal Contempt of Court in *No. 25435* " because there was insufficient evidence to (1) "[show] that [Aul] made the telephone call on January 30th for a purpose not authorized," and (2) prove that "[Aul] was given an official 'process, injunction, or other mandate *of the court*' to appear at a given place, date, and time." (Emphases in original.)

## DECISION

In No. 25434 (FC–CR No. 02–1–0021), we affirm the judgment convicting Aul of a January 30, 2002 Violation of an Order for Protection, HRS § 586–11.

In No. 25435 (FC–CR No. 02–1–0057), we reverse the judgment convicting Aul of an April 2, 2002 charge of Criminal Contempt of Court, HRS § 710–1077(1)(g).

## RELEVANT BACKGROUND

On January 29, 2002, in FC–D No. 01–1–0190, a divorce case initiated by Karen Aul (Karen) against Aul, Judge Murashige, after a hearing on January 11, 2002, entered two orders on January 29, 2002. The first was an Order Re: Plaintiff's Motion for Temporary Relief Filed December 6, 2001 and Defendant's Motion for Temporary Relief Filed December 17, 2001. This order stated, in relevant part, as follows:

> **Criminal contempt of court.** (1) A person commits the offense of criminal contempt of court if:
>
> . . . .
>
> (g) The person knowingly disobeys or resists the process, injunction, or other mandate of a court[.]
>
> The charge stated that "[o]n or about the 2nd day of April, 2002, ... HANK AUL did knowingly disobey or resist the process, injunction or other mandate of the court, to wit: failed to appear in court[.]"

---

**3.** HRS § 586–11 (Supp.2003) states, in relevant part, as follows:

> **Violation of an order for protection.** (a) Whenever an order for protection is granted pursuant to this chapter, a respondent or person to be restrained who knowingly or intentionally violates the order for protection is guilty of a misdemeanor. A person convicted under this section shall undergo domestic violence intervention at any available domestic violence program as ordered by the court.

**4.** HRS § 710–1077 (1993) states, in relevant part, as follows:

2. [Karen] shall be awarded temporary primary physical custody of [Daughter] (female, July 6, 1996).

3. [Aul] shall be allowed visitations with [Daughter]. [Aul] shall be allowed day visits on Monday, Wednesday and Friday from 3:00 p.m. to 5:00 p.m. at the Kilauea Neighborhood Park. During [Aul's] visitation, [Aul] shall not remove [Daughter] from the Kilauea Neighborhod Park.

[Karen] shall bring [Daughter] to Kilauea Neighborhood Park to allow [Aul] to have his day visits.

During [Aul's] visitation, [Karen] may be physically present. However, [Karen] shall not interfere with [Aul's] visitation.

4. [Aul] shall be prohibited and restrained from telephoning [Daughter]. However, [Daughter] shall be allowed to telephone [Aul] at any time.

. . . .

6. Pursuant to HRS Chapter 586, a temporary restraining order (TRO) shall be issued against [Aul] for a period of six months from the date of the hearing.

The second was an Order for Protection (January 29, 2002 Order for Protection) that stated, in relevant part, as follows:

**IT IS HEREBY ORDERED** that this Family Court Order for Protection is issued pursuant to HRS, Section 586–5.5, and remains in effect until [July 11, 2002].

**IT IS FURTHER ORDERED** that:

. . . .

B. CONTACT BETWEEN PARTIES

X [Aul] is prohibited from contacting [Karen].

X [Aul] is prohibited from telephoning, writing or otherwise electronically communicating (by recorded message, pager, etc.), including through third parties, with [Karen] and any children residing with [Karen].

However, [Daughter] shall be allowed to telephone [Aul] and [Aul] shall be allowed visitation with [Daughter] on Monday, Wednesday and Friday from 3:00 p.m. to 5:00 p.m. at the Kilauea Neighborhood Park. [Aul] shall not remove [Daughter] from the Kilauea Neighborhood Park.

During said visitation at the park, [Karen] may be physically present.

. . . .

X Notwithstanding the foregoing order, [ ][Aul] may have LIMITED contact with [Karen] by telephone/in person for the purpose of [X] visitation [ ] counseling or [X] *mediation sessions.*[5]

. . . .

X [ ] [Karen] [X][Aul] shall have visitation with [Daughter] as follows:

. . . .

X *[X] Day visits only on Monday, Wednesday and Friday at the Kilauea Neighborhood park from 3:00 p.m. to 5:00 p.m. During said visitation, [Aul] shall not remove [Daughter] from the Kilauea Neighborhood park. [Karen] may be physically present during [Aul's] visitation with [Daughter].*

. . . .

X The terms and conditions of this Order were explained by the Court to the parties in open court. The parties acknowledged that they understood the terms and conditions of the order and the possible criminal sanctions for violating it. The parties have notice of this Order.

(Footnote added.)

On January 28, 2002, Karen brought Daughter to the Kilauea Gym for her visitation with Aul. According to Karen, the weather that day was "dumping rain" so Karen brought a plastic bag with five books for Daughter and Aul to read. Karen "pulled up right next-door to his truck because it was raining so hard." Aul stayed in his truck for "quite a long time" so Daughter "crawl[ed] out of the car seat and ... climbed up into the front passenger seat ." Karen testified that the following events then occurred:

Q. Once he did get out of his vehicle what did he do?

5. The fact that the first "[ ]" does not have an "X" in it causes this sentence to be ambiguous.

A. First he went around to the back door where [Daughter's] car seat was and opened it. He saw that she wasn't in there, he looked, he saw her in the front seat with me. But instead of getting her out he came around the other side and got into the back seat behind my driver's seat.

Q. Did he say anything to you?

A. Yes, he did.

Q. What did he say to you?

A. Well, he put his arms around me and he was trying to kiss me and ask me if we could be together and he missed me and he wanted to make love to me and all those types of things. And when I wouldn't respond he started getting aggressive and doing his normal: Aren't you worried about what everybody else is saying about you? And degrading me and that type of thing.

Q. Did you say anything to him?

A. I didn't want to have any type of confrontation with him considering [Daughter] was right there staring at both of us. So I just looked at my watch and said: You've wasted 15 minutes and I suggest you guys get started on your visit.

Q. And what did [Aul] do when you said that?

A. He got mad and said some more disparaging comments, but he did get out of the car and went around and got [Daughter] out of the front seat with the bag of books.

On January 30, 2002, Aul called Karen's cell phone. At the trial, when asked "What did he say?" Karen responded, "I don't remember the content of the conversation. I just told him that he wasn't supposed to be calling me anymore and that I was on the way to the police station to report the phone call."

Aul visited the Hanalei police station later that day. Officer Kennison Nagahisa (Officer Nagahisa) testified that Aul "basically came into the substation to talk to an officer pertaining to a protective order with his wife.... And he basically was asking me questions ... about the protective order. But he didn't have a copy with him so I was unable to determine if he violated at that point." According to Officer Nagahisa, Aul told him that "he did call Karen to ask about their child and visitation rights. And he also stated that he did ask—talk to her about their relationship, and he wasn't sure if that was a violation of the protective order at that time."

Karen testified that "[p]robably about two weeks" after the January 28, 2002 rainy day visit, Aul and Daughter "had begun visitations at the visitation center and [Daughter] brought [the book *The Prince of Egypt*] home with her from the visitation center." This was one of the five books Daughter left in Aul's truck at the Kilauea Gym during the January 28, 2002 rainy day visit. Starting on the blank page just inside of the book's front cover, and ending on the next page, Aul wrote a letter that stated:

I would do anything to get back to where we were B–4 all this sinning started the devil has a good grip on me, but I see now and only now how good and special you are to me I'll never forget how much you loved me you R my only true love I'm so weak wish you would give me another chance you're the only one who ever loved me, I feel so bad and left out forever Boy I'm I stupid please forgive me. You know I was good to you some of the time, think back, 'its not that hard to do, we had fun. And the best sex ever! I'll never have another like you I know and it makes me sick and real sad. What was I thinking or was I? I guess not, your so right I learned so much latley. I blue it. I'm such a stupid guy I cant belive its coming to an end I wanted to be old w/you and only you, your the only love of my life I would love to talk to you, but some how I understand your very disaponted with me, I betraded you and I get what I desurve, but not by keeping [Daughter] away from me She need her daddy and I need her too! She gives me a reason to keep on going on. I'm sick without you guys in my lonely life Life real suck's without you! I hate it I so sorry I *will* make it up to you give me a chance. I do anything, $, love, work anywhere do anything you want me to do I'm really drug free I know you don't belive me but, I am. if you call I wouldent tell anyone

Love [s/Hank Aul] 2–3–01

(Spelling and punctuation errors in original.)

Karen testified that she purchased the book after February 3, 2001 and, therefore, the "2–3–01" date was not accurate.

On March 14, 2002, Police Officer Sylvester Oliveira (Officer Oliveira) confronted Aul about the letter Aul wrote in the book. According to Officer Oliveira, Aul initially "denied writing the letter to his wife. He said that he wrote the letter to his daughter." However, when Officer Oliveira was asked how Aul responded when shown a copy of the letter, this was Officer Oliveira's response: "Oh yes ... he smiled and he told me that he did write the letter ... after he was caught by his wife having an affair." Officer Oliveira further testified that he then arrested Aul and "gave him a court date, Family Court on April 2nd at 1330 hours, which is 1:30 p.m." It appears that Officer Oliveira communicated this notice of court date and time orally and not in writing. There is no evidence of a written notice. Aul did not appear at the scheduled hearing.

A jury-waived trial on all of the charges was held on June 10, 2002. At the conclusion of the trial, the court orally decided, in relevant part, as follows:

> As to 02–1–0021, these have to do with violation of protective order—order for protection. The Court, in looking at Exhibit P–6, which is the order for protection, the order for protection sets out under what conditions Mr. Aul can have contact with [Daughter]. [Daughter] is allowed to call him, there's nothing that allows him to call [Daughter].
>
> . . . .
>
> As to Count 3, which has to do with January 30th, which is after the January 29th, 12:40, order for protection, Court will find the state has proven its case beyond a reasonable doubt and find Mr. Aul guilty of Count 3.
>
> As to FC–CR Number 02–1–0057, the book incident, which again has to do with communicating with [Karen], Court will find that the state has proven its case beyond a reasonable doubt and find Mr. Aul guilty of that offense. The Court will

also find Mr. Aul guilty of the offense of contempt.

On October 29, 2002, Aul filed a notice of appeal in each of the three cases. On July 2, 2003, the appeals were assigned to this court.

## STANDARDS OF REVIEW

Appellate review of a circuit court's findings of fact in a pretrial ruling is conducted according to the following standard:

> Appellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the clearly erroneous standard. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. The circuit court's conclusions of law are reviewed under the right/wrong standard.

*State v. Locquiao,* 100 Hawai'i 195, 203, 58 P.3d 1242, 1250 (2002) (internal quotation marks and citations omitted) (quoting *State v. Harada,* 98 Hawai'i 18, 22, 41 P.3d 174, 178 (2002)). "A conclusion of law that is supported by the trial court's findings of fact and that reflects an application of the correct rule of law will not be overturned." *Dan v. State,* 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994) (internal quotation marks and citation omitted).

Substantial evidence is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *State v. Richie,* 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (internal quotation marks and citation omitted).

## DISCUSSION

Aul argues that "there was insufficient evidence to convict [him] of HRS § 586–11 and § 710–1077."

Regarding the challenged conviction of the HRS § 586–11 charge, Aul notes that (1) the January 29, 2002 Order for Protection permitted him to have "LIMITED contact with

[Karen] by telephone/in person for the purpose of ... visitation ... or mediation sessions[,]" and (2) Karen "didn't remember what he said." Aul argues that since the "phone call on January 30th fell within the scope of the limited contact allowed by the [January 29, 2002] Order for Protection, the State failed to prove beyond a reasonable doubt that HRS § 586–11 was violated."

■ This point has no merit. Although Karen may not have remembered what Aul said to her when he phoned her on January 30, 2002, there is evidence that after Aul called Karen, he went down to the police station and told Officer Nagahisa that he called Karen to "ask about [Daughter] and his visitation rights and to talk about their relationship." As noted above, the January 29, 2002 Order For Protection states that

X̲ [Aul] is prohibited from contacting [Karen].

X̲ [Aul] is prohibited from telephoning, writing or otherwise electronically communicating (by recorded message, pager, etc.), including through third parties, with [Karen] and any children residing with [Karen].

However, [Daughter] shall be allowed to telephone [Aul] and [Aul] shall be allowed visitation with [Daughter] on Monday, Wednesday and Friday from 3:00 p.m. to 5:00 p.m. at the Kilauea Neighborhood Park. [Aul] shall not remove [Daughter] from the Kilauea Neighborhood Park. During said visitation at the park, [Karen] may be physically present.

. . . .

X̲ Notwithstanding the foregoing order, [ ][Aul] may have LIMITED contact with [Karen] by telephone/in person for the purpose of [X] visitation [ ] counseling or [X] *mediation sessions.*

When Aul knowingly contacted Karen to discuss a topic other than visitation, he violated § 586–11. Therefore, we affirm the conviction of Count 3 of FC–CR No. 02–1–0021

(No. 25434), which is the conviction of the January 30, 2002 violation of the January 29, 2002 Order for Protection.

With regard to the § 710–1077 charge, Aul contends that "the State failed to show that [Aul] was given an official 'process, injunction, or other mandate of the court.'" Aul notes that the State's Exhibit P–4, which is a certified copy of the court minutes for the family court on April 2, 2002, "merely shows that [Aul] did not show up for court on that date." The only relevant evidence is Officer Oliveira's testimony that he told Aul to show up at "Family Court on April 2nd at ... 1:30 p.m." The State responds that "it is the well established process that after being arrested and upon being released on bail that criminal defendants such as Aul are given a date to appear in court. This is the process of our courts to efficiently administer the criminal justice system."

The relevant questions are (1) When "criminal defendants such as Aul are given a date to appear in court," who gives the date? and (2) Is this alleged "process of our courts" authorized by law?

HRS § 803–6 (Supp.2003)[6] describes the actions that must and may be taken by the person making the arrest during and after an arrest. The first procedure described is the procedure that (a) may be used by a police officer "[i]n any case in which it is lawful for a police officer to arrest a person without a warrant for a misdemeanor, petty misdemeanor or violation[,]" and (b) must be used by (i) a police officer in all other cases, and (ii) all non-police officers authorized by law to make the arrest. This first procedure is described in HRS § 803–6(a) as follows:

§ 803–6 Arrest, how made. (a) At or before the time of making an arrest, the person shall declare that the person is an officer of justice, if such is the case. If the person has a warrant the person should show it; or if the person makes the arrest without warrant in any of the cases in which it is authorized by law, the person should give the party arrested clearly to

6. The House Journal Standing Committee Reports 712 states that "The purpose of this bill is to permit the use of a citation in lieu of a physical arrest when it is lawful for a police officer to arrest a person without a warrant for a misdemeanor, petty misdemeanor or violation." H.R. 1975 Leg., Regular Sess. (Haw.1975).

understand for what cause the person undertakes to make the arrest, and shall require the party arrested to submit and be taken to the police station or judge. This done, the arrest is complete.

 The second procedure is an option available (a) only to a "police officer" and (b) only "[i]n any case in which it is lawful for a police officer to arrest a person without a warrant for a misdemeanor, petty misdemeanor or violation[.]" This second procedure is described in the remainder of HRS § 803–6 as follows:

(b) In any case in which it is lawful for a police officer to arrest a person without a warrant for a misdemeanor, petty misdemeanor or violation, the police officer may, but need not, issue a citation in lieu of the requirements of (a), if the police officer finds and is reasonably satisfied that the person:

(1) Will appear in court at the time designated;

(2) Has no outstanding arrest warrants which would justify the person's detention or give indication that the person might fail to appear in court; and

(3) That the offense is of such nature that there will be no further police contact on or about the date in question, or in the immediate future.

(c) The citation shall contain:

(1) Name and current address of offender;

(2) Social security number;

(3) Description of offender;

(4) Nature of the offense;

(5) Time and date;

(6) Notice of time and date for court appearance;

(7) Signature of officer (badge);

(8) Signature of offender agreeing to court appearance;

(9) Remarks; and

(10) Notice—you are hereby directed to appear at the time and place designated above to stand trial for the offense indicated. A failure to obey this citation may result in a fine or imprisonment, or both.

(d) Where a citation has been issued in lieu of the requirements of [subsection](a) above, the officer who issues the summons or citation may subscribe to the complaint under oath administered by any police officer whose name has been submitted to the prosecuting officer and who has been designated by the chief of police to administer the oath.

(e) If a person fails to appear in answer to the citation; or if there is reasonable cause to believe that the person will not appear, a warrant for the person's arrest may be issued. A knowing failure to appear in answer to the citation may be punished by a fine of not more than $1,000 or imprisonment of not more than 30 days or both.

It is clear that the "citation" permitted by this second procedure is a written/printed document. There is no evidence that such a written/printed citation was issued to Aul. Officer Oliveira's oral notice of "a court date, Family Court on April 2nd at 1330 hours, which is 1:30 p.m." was not authorized by HRS § 803–6.

If Officer Oliveira had issued a written/printed citation in compliance with HRS § 803–6, Aul's failure to appear on the date stated on the citation (a) possibly would have been a violation of HRS § 803–6(e), but (b) would not have been a violation of HRS § 710–1077(1)(g) because Officer Oliveira is not an officer or agent of a court and a written/printed citation issued by Officer Oliveira is not "the process, injunction, or other mandate of the court[.]"

 There being no evidence that when Aul, on April 2, 2002, failed to appear in court, Aul violated HRS § 710–1077(1)(g) by knowingly disobeying or resisting "the process, injunction, or other mandate of a court", Aul cannot be convicted of Criminal Contempt of Court, HRS § 710–1077(1)(g).

## CONCLUSION

Accordingly, in No. 25434 (FC–CR No. 02–1–0021), we affirm that part of the October 7, 2002 Judgment convicting Aul of a January

30, 2002 Violation of an Order for Protection, HRS § 586–11.

In No. 25345 (FC–CR No. 02–1–0057), we reverse that part of the October 7, 2002 Judgment convicting Aul of an April 2, 2002 Criminal Contempt of Court, HRS § 710–1077(1)(g).